**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Kevin R. SMITH, Dalian C. Stewart, and Steve Taylor, Defendants–Appellants.**

**Nos. 93–1442, 93–1443 and 93–1470.**

United States Court of Appeals, Seventh Circuit.

Argued June 10, 1993.

Decided Aug. 26, 1993.

Christopher T. Van Wagner (argued), Office of U.S. Atty., Madison, WI, for plaintiff-appellee.

Gregory N. Dutch (argued), Montie & Youngerman, Madison, WI, for defendant-appellant Kevin R. Smith.

Rick B. Meier (argued), Mandell & Ginsberg, Madison, WI, for defendant-appellant Dalian C. Stewart.

David M. Houser (argued), Stoughton, WI, for defendant-appellant Steve Taylor.

Before CUDAHY and RIPPLE, Circuit Judges, and ALDISERT, Senior Circuit Judge.[*]

ALDISERT, Senior Circuit Judge.

These consolidated appeals from sentences imposed following conditional guilty pleas require us to meet a complex problem associated with the temporary detaining of a person by the police under circumstances governed by the teachings of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny, familiarly known as a *Terry* stop. Such a stop usually implicates Fourth Amendment ramifications concerning reasonable "seizure" of the person or probable cause to make an arrest. These issues are present here where appellants were not only detained but also handcuffed during a *Terry* stop. We must decide also whether the circumstances of this stop required safeguards protecting the familiar Fifth and Sixth Amendment rights articulated in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Appellants Kevin R. Smith, Dalian C. Stewart and Steve Taylor each pleaded guilty to conspiring to possess cocaine base with intent to distribute, 21 U.S.C. §§ 841(a)(1) and 846, expressly reserving the right to appeal the denial of their motions to suppress evidence. *North Carolina v. Alford*, 400 U.S. 25, 37–38, 91 S.Ct. 160, 167–168, 27 L.Ed.2d 162 (1970); Fed.R.Crim.P. 11(a)(2). Collectively, they raise five issues on appeal.

Smith and Stewart argue that the district court erred in holding that they were not arrested before probable cause existed, based on the court's finding that they were not under arrest at the time they were placed in handcuffs. All appellants contend that their Fourth Amendment rights were violated, because the police had neither probable cause nor a reasonable suspicion to justify stopping the taxicab in which appellants were passengers. Stewart argues also that the court erred in admitting statements he made to the police, because the officers questioned him before reading him his *Miranda* rights. Stewart and Taylor appeal their sentences on the grounds that there was insufficient evidence to establish that the quantity of cocaine base attributable to them was greater than fifty grams.

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. This court has jurisdiction to review the judgments of conviction and the sentences pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. Appeal was timely filed under Rule 4(b) of the Federal Rules of Appellate Procedure.

I.

Our review of the district court's determination that a seizure was reasonable,

[*] Ruggero J. Aldisert of the United States Court of Appeals for the Third Circuit is sitting by designation.

because either probable cause or reasonable suspicion existed, is the clearly erroneous standard. *United States v. Spears*, 965 F.2d 262, 269 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 502, 121 L.Ed.2d 438 (1992).

■ Similarly, in reviewing the district court's determination on the issue of "custodial interrogation," we will accept the district court's underlying factual findings and its resolution of credibility unless they are clearly erroneous. *United States v. Fazio*, 914 F.2d 950, 955 (7th Cir.1990). The ultimate issue of whether there was a custodial interrogation is a mixed question of law and fact subject to our independent review. *Id.*

■ The amount of drugs involved in a conspiracy is a factual determination by the sentencing court, which we review for clear error. *United States v. Price*, 988 F.2d 712, 720 (7th Cir.1993). A factual finding is clearly erroneous only if, after reviewing all of the evidence, we are left with the firm conviction that a mistake has been committed. *Id.*

## II.

A two-day suppression hearing was conducted before a magistrate judge who recommended that suppression motions made by each of the appellants be denied, and the district court thereafter accepted the recommendations. *United States v. Blanchard*, No. 92–CR–103–S (W.D.Wis. Dec. 4, 1992). Testimony and evidence presented at the suppression hearing revealed the following facts.

On August 19, 1992, Detective Marion Morgan of the Madison, Wisconsin Police Department received a call from a citizen informant, an employee at a Travelodge in the Sommerset–Fiedler neighborhood of Madison. The Madison police were aware that this area had a high incidence of drug trafficking, and motel-based drug trafficking was particularly common.

The informant provided Detective Morgan with the information that three people, two with Chicago addresses, had obtained three rooms at the Travelodge, none of the guests had registered a vehicle, one paid cash for two of the rooms, and another paid cash for the third room. The clerk registering these guests observed that one possessed a large sum of money.

By August 19, the guests had been in the motel for several days, and during that time there had been much foot traffic and short visits to each of the rooms. The names given by the three men who signed for the rooms were Dalian Stewart, Kevin Smith and John Johnson. Based on information provided by the informant, the detective learned that Stewart previously had been involved in an armed robbery. Also on August 19, police officers found numerous stapled "gem packs"[1] containing crack cocaine in a bush in the general proximity of the Travelodge.

That afternoon Detective Morgan briefed other officers on the suspected drug activity at the Travelodge. Two officers, Timothy Peregoy and Jeffrey Twing, went to the Travelodge to investigate and learned that in addition to the heavy foot traffic, 40 telephone calls to Chicago had been placed from one of the suspects' rooms the previous day. The hotel clerks told the officers that from what they had seen they suspected drug activity in the suspects' rooms. Peregoy requested that the hotel staff preserve the refuse from one of the rooms that had yet to be cleaned.

The officers then reserved rooms in the motel from which they could conduct surveillance. At about 7:00 that evening, the officers returned to the Travelodge to begin surveillance. Other officers watched the motel from vehicles stationed nearby. While walking down the hallway to the surveillance room, Officer Peregoy passed a man later identified as Stewart.

The night clerk informed Peregoy that one of the rooms had been cleaned and that the maid had seen a two-to-three-inch roll of money inside a cup in the room, the outside bill being a $100 denomination. She also reported having seen a single-edged razor blade next to the cup. In the collected trash, Peregoy found a brown sandwich bag upon

---

1. Testimony indicated that a gem pack is a small version of the common Ziplock transparent plastic bag with a top that can be opened and resealed.

which two columns of numbers, one with a dollar sign, were handwritten. These were believed to represent drug quantities and prices. The officer also found two individual yellow gem packs containing traces of what appeared to be crack cocaine, two bags containing 25 to 50 empty gem packs and two sandwich baggies with the corners removed. These items led the officers to believe that cocaine base had been packaged in the suspect's room.

Officer Twing had taken up surveillance in a room from which he could observe the parking lot, the door to one of the rooms and the main desk of the hotel; he knew that the three suspects were black males, and he also had a general description of Stewart. At 8:30 p.m., the motel clerk called Twing to tell him that one of the suspects had telephoned for the number of the Greyhound bus station. The officer then called Greyhound and learned that there were buses leaving for Chicago at 9:40 p.m. and 1 a.m.

The officers observed three black men go to the motel office within five minutes of each other and then leave the motel, walking in a westerly direction. Soon thereafter the police were notified that the suspects had checked out. The dress and basic descriptions of each of the three men were noted by the officers, and the information was broadcast to other officers involved in the surveillance.

After surveying the parking lot, Twing returned to the motel office to confirm that the suspects had checked out. The motel clerk told him that one of the men had asked for cab service information. Two officers in an unmarked vehicle, who had received the broadcast regarding the suspects, saw a person in the area behind the Travelodge wearing clothes similar to those described in the broadcast. The officers also saw some other people, whom they were unable to identify, walking toward the Fiedler–Sommerset area and relayed this information to their colleagues.

These officers then learned that a Badger cab had been called to a location on Fiedler Lane, and, knowing that Badger cabs often transported passengers to the bus station, they proceeded to Fiedler Lane. Almost immediately upon reaching Fiedler Lane, the officers spotted a Badger cab, and they positioned themselves so as to observe it. As the cab proceeded past the officers' vehicle, one officer observed a black male passenger in the left rear seat and another black man in the front passenger seat. The officers followed the cab and at an intersection an officer noticed that the man in the right rear passenger seat was wearing a coat like that worn by one of the suspects at the motel.

After broadcasting this information to other officers, they were told by Peregoy to stop the cab before it reached the bus station and wait until he arrived. The officers stopped the cab in front of the bus station at approximately 9:40 p.m. As the officers approached the cab, they ordered all of the occupants to keep their hands up where the officers could see them. One of the officers may have had his pistol out, holding it down at his side.

There were six people in the cab, including the driver. All five passengers were black men. Less than a minute after the initial stop, Peregoy and Detective Al Rickey arrived on the scene. Peregoy asked Taylor to get out of the car. Taylor denied having any weapons or drugs on his person and consented to a pat-down search. Peregoy then checked Taylor's pockets, and in Taylor's wallet, Peregoy found what he believed to be a marijuana cigarette. Peregoy then turned Taylor over to another officer, telling him that Taylor was under arrest. Taylor was handcuffed.

Meanwhile, other officers arrived on the scene. Although the number of police officers present is not free from doubt, it is agreed that the officers outnumbered the suspects. At this time, Officer Twing identified Taylor as the same person he had seen at the motel and then said that the remaining occupants of the cab were wearing clothing similar to that worn by the other men he had seen at the Travelodge. Officer Twing removed the right front passenger, later identified as Dalian Stewart, from the cab, patted him down and placed him in handcuffs. Stewart was not told that he was under arrest, and he was directed to sit on the grass by the side of the road. Smith was

then removed from the cab, handcuffed and seated on the grass by the side of the road. Both Stewart and Smith had telephonic pagers, which Officer Twing testified were indicative of drug trafficking.

Officer Twing returned to Stewart and asked him if he had any property in the cab, and Stewart answered that he had a large athletic bag in the trunk. Twing retrieved the bag from the trunk, Stewart identified it as his and the officer then asked Stewart if he could search the bag. Stewart consented. Inside the bag, Twing found a small black digital scale with white powdery residue on it, two boxes of Glad plastic sandwich bags, $600 in cash, two or three medium size Ziplock baggies, three yellow gem packs and four small, single-edged razor blades. Twing testified that based on his experience he believed these items to be related to drug trafficking.

After Smith was asked if he had anything in the cab, he replied that he had a shirt and trousers in a bag in the trunk. Smith described the clothes as a Miami Hurricane shirt and a blue pair of Guess jeans. Twing found a Nike athletic bag in the trunk and asked Smith if that was the bag containing his clothes. Smith said that it was but that the bag itself was not his. Twing asked the other suspects if they owned the bag, and when no one responded, he proceeded to examine its contents. In the bag, Officer Twing found the clothing described by Smith; he also found a digital scale identical to the one found in Stewart's bag and also containing powdery residue, two boxes of sandwich baggies, a razor blade holder, a baggie containing a small stapler and a box of staples, and a pair of shorts with $1,910 in cash in one of the pockets.

During this time, Eddie Hall, who had been sitting in the front center seat of the cab, was asked to leave the cab, was told that he was not under arrest and was patted down for weapons and handcuffed. The fifth man, Dale Blanchard, who had been seated in the middle of the rear seat holding a bag of groceries, was then asked to leave the cab. In response to questioning by Officer Peregoy, Blanchard said the bag belonged to him and consented to its search. Inside, Peregoy discovered a plastic bag protruding from under the top of a full Miracle Whip jar from which the plastic seal had been removed. He tugged on it until he could see its contents— an off-white, hardened substance consistent in appearance with cocaine base. Blanchard was then told he was under arrest.

During the time that the various officers were removing passengers from the cab, Detective Rickey spoke to the cab driver and learned that all the occupants had been picked up together and that they were all en route to the bus station to go to Chicago. The cab driver told him that one of the occupants had made the statement that "five niggers from Chicago come to Madison and do good," or something to that effect. Sometime during the stop, but prior to the formal arrest of Stewart, Peregoy asked Stewart if he remembered passing Peregoy in the motel hallway. Stewart smiled and nodded.

Officers Peregoy, Twing and Rickey gathered to share their accumulated knowledge. Peregoy then directed that Smith and Stewart be placed under arrest. The district court found that these arrests occurred within fifteen or twenty minutes of the initial stop. All five suspects were then transported to the police station.

### III.

On September 9, 1992, the Grand Jury returned a two-count indictment against the three appellants, charging them with unlawfully conspiring to possess cocaine and cocaine base with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 846 and 18 U.S.C. § 2. On September 25, an arraignment was held, and each appellant pleaded not guilty to both counts of the indictment. Thereafter, appellants filed various motions to suppress evidence based upon illegal arrest. A two-day evidentiary hearing was held on October 10 and 11, 1992. The magistrate recommended that the district court deny the motions, which the court did on December 4, 1992. Each appellant subsequently pleaded guilty to Count 1 of the indictment, reserving for appeal the issues raised in the suppression motions.

Smith, Stewart and Taylor were sentenced on February 11, 1993. No witnesses were called at the sentencing hearing. To establish the quantity of cocaine base to be attributed to each appellant, the government relied on statements made by Hall, Smith and Stewart in their respective plea hearings. Each had been questioned under oath by the court, but none were subjected to cross examination. None of them received notice of the others' plea hearings or attended the others' hearings, either personally or through counsel. At the conclusion of the sentencing hearing, the court found that cocaine base totalling 107.65 grams was attributable to Stewart and Taylor, and 103.54 grams was attributable to Smith. The court accepted the probation office recommendations and sentenced each appellant to eleven years in prison to be followed by five years of supervised release.

## IV.

Smith and Stewart argue that they were under arrest as a matter of law when the police handcuffed them after removing them from the cab and that, at that moment, the police lacked probable cause to arrest them. From this they proceed to the next premise of their syllogism, that "without probable cause to arrest, the police violated the defendants' Fourth Amendment rights . . . ," Appellants' Br. at 27, and finally to the conclusion that "all evidence obtained subsequent to the arrest must be suppressed. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)." *Id.*

We will now proceed to analyze *Terry* stop jurisprudence as it relates to Fourth Amendment concerns. It bears emphasis that most of our judicial experience with temporary detentions, the *Terry* stop cases, involves Fourth Amendment search and seizure problems. It bears further emphasis that in Stewart's appeal, as indicated previously, we must also discuss the Fifth and Sixth Amendment *Miranda* consequences of Stewart's temporary detention prior to his arrest and of the statements he made, which were later used as evidence against him. We will first address the Fourth Amendment concerns raised by all three appellants.

### A.

The district court determined that the handcuffing, under the circumstances of this case, did not constitute an arrest, the court holding that appellants were lawfully subjected to an investigatory *Terry* stop.

We have been unwilling to hold that the handcuffing of a suspect without probable cause to arrest is unlawful per se. *United States v. Glenna,* 878 F.2d 967, 972 (7th Cir.1989). Rather, we have observed that in the "rare" case wherein common sense and ordinary human experience convince us that an officer believed reasonably that an investigative stop could be effectuated safely only through the use of handcuffs, " 'we will not substitute our judgment for that of the officers as to the best methods to investigate.' " *Id.* (quoting *United States v. Boden,* 854 F.2d 983, 993 (7th Cir.1988)).

Six other courts of appeals have similarly held that placing a suspect in handcuffs does not necessarily turn a lawful *Terry* stop into an illegal arrest for Fourth Amendment purposes. *See, e.g., United States v. Esieke,* 940 F.2d 29, 36 (2d Cir.) (use of handcuffs and leg irons may not turn otherwise permissible detention into detention that violates Fourth Amendment), *cert. denied,* —— U.S. ——, 112 S.Ct. 610, 116 L.Ed.2d 632 (1991); *United States v. Saffeels,* 982 F.2d 1199, 1206 (8th Cir.1992) (handcuffing of defendant did not turn stop into arrest), *cert. filed,* No. 92–8022 (March 18, 1993); *United States v. Taylor,* 716 F.2d 701, 709 (9th Cir.1983) (neither use of handcuffs nor requiring suspect to lie down while being frisked necessarily convert *Terry* stop into arrest); *United States v. Merkley,* 988 F.2d 1062, 1064 (10th Cir.1993) (displaying firearms and using handcuffs to freeze situation temporarily in order to ensure safety of officers and public are appropriate in reasonable *Terry* stop); *United States v. Kapperman,* 764 F.2d 786, 790 n. 4 (11th Cir.1985) (handcuffing does not automatically convert investigative detention into arrest, and police may take reasonable action to protect themselves during investigative detentions); *United States v. Williams,* No. 91–3097, 1992 WL 308584, at *2 (D.C.Cir. Oct. 6, 1992) (unpublished opinion) (handcuff-

ing suspect who has fled does not automatically convert seizure into arrest, nor does relocating suspect short distance for reasonable purpose).

### B.

██ Thus, the handcuffing of the defendants did not necessarily turn a legal investigative stop into an arrest. Our inquiry, however, is not at an end. We must still determine whether the district court erred in finding that the temporary detention here was lawful. "A *Terry* investigative stop is a brief detention which gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity." *United States v. Boden,* 854 F.2d 983, 992 (7th Cir.1988).

██ Because such a stop is a lesser restriction on freedom of movement than an arrest, it is allowed on a showing of reasonable suspicion rather than probable cause. *Id.* Unfortunately, the line between a lawful *Terry* stop and an unlawful arrest is not bright. *United States v. Glenna,* 878 F.2d 967, 971 (7th Cir.1989). "[I]n evaluating the reasonableness of an investigative stop, we examine first whether the officers' action was justified at its inception and, second, whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.*

### 1.

██ To justify the initial contact, police officers must have an objective basis for suspecting the persons stopped of criminal conduct. *Id.* The totality of the evidence must justify a reasonable and articulable suspicion that the men in the taxicab were involved in illegal drug activity. *See United States v. Rodriguez,* 831 F.2d 162, 165 (7th Cir.1987), *cert. denied,* 485 U.S. 965, 108 S.Ct. 1234, 99 L.Ed.2d 433 (1988). The Supreme Court has emphasized in *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), that "the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for sus-

pecting the particular person[s] stopped of criminal activity."

*United States v. Hensley,* 469 U.S. 221, 232–33, 105 S.Ct. 675, 682, 83 L.Ed.2d 604 (1985), teaches that a stop based on information from another law enforcement officer or agency is valid to the extent that the officer relaying the information is able to satisfy the *Terry* "reasonable suspicion" standard. *United States v. Nafzger,* 974 F.2d 906, 911 (7th Cir.1992). In this instance, Officer Peregoy instructed the officers in the unmarked police car to stop the taxi, therefore, we must decide if his knowledge was sufficient to meet the reasonable suspicion standard.

We are satisfied that the information possessed by Officer Peregoy, as set forth in detail in Part II, was sufficient to meet these requirements, i.e., appellants' paying for the motel rooms in cash and appearing to have a substantial amount of cash, the heavy foot traffic to and from the rooms, the 40 telephone calls to Chicago, the presence of a two-to-three-inch roll of money with the outside bill being a $100 denomination, the discovery of gem packs and traces of what appeared to be crack cocaine and the paper showing columns of figures. We are satisfied that, objectively considered, the information possessed by the officers was sufficient to meet the *Terry* standard of making a "brief detention which gives the officers a chance to verify (or dispel) well-founded suspicions that a person has been ... engaged in criminal activity." *Boden,* 854 F.2d at 992.

### 2.

██ Having determined that the police had a reasonable suspicion justifying their stop of appellants, we must now consider whether the duration and scope of the stop were reasonable under the circumstances. We have held that a stop is reasonable when the degree of suspicion is adequate in light of the degree and duration of the restraint. *United States v. Chaidez,* 919 F.2d 1193, 1198 (7th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 209, 116 L.Ed.2d 167 (1991). Courts will look to several factors in determining the distinction between a stop and an arrest, among them are the officers' intent, impressions conveyed, length of stop, ques-

tions asked and any search made. *United States v. Serna–Barreto*, 842 F.2d 965, 967 (7th Cir.1988). This list is not exhaustive nor are any of the factors decisive. *Id.*

Officer Twing testified that the taxi was stopped at approximately 9:40 p.m. The district court found that all of the defendants were under arrest within fifteen or twenty minutes of the initial stop. Twing also testified that he handcuffed the defendants because of safety concerns, considering the time of night, the general environment of the investigation and the nature of the alleged offenses. We note too that Stewart's involvement in a prior armed robbery had been communicated to the officers earlier in the investigation.

We hold that the degree and duration of the restraint were reasonable under the circumstances. Accordingly, we conclude that the district court did not err in holding that there was a legitimate *Terry* stop and no unreasonable seizure of the persons of the three appellants, even though they were handcuffed prior to arrest.

### C.

As to the seizure of the incriminating items found in the cab, we are satisfied that no Fourth Amendment violation occurred when the bag containing Smith's clothing was examined. Smith volunteered that his clothes were in the bag, but denied ownership of the bag. None of his four companions claimed ownership, and therefore they cannot invoke the Fourth Amendment to challenge its search and the consequent discovery of the digital scale, the boxes of sandwich baggies, a razor blade holder, a stapler and a pair of shorts containing $1,910 in cash. Appellants cannot have it both ways; they cannot eschew ownership of the bag and then assert that a search of it violates their Fourth Amendment rights. *See Rakas v. Illinois*, 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978) ("A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.").

The search of this bag did not violate the Fourth Amendment, and the district court did not err in denying the motion to suppress.

### V.

The search of the Stewart bag, however, presents a more serious problem. In the district court, Stewart objected to the admission of his statements to the officers about the bag, on the grounds that he was in custody when these statements were made and he had not been given his *Miranda* rights. In this appeal he asks that we vacate his sentence and permit him to withdraw his plea. The district court rejected his contention: "Defendants Stewart and Smith's rights under *Miranda* were not violated because they were not in custody when they made these statements. *See United States v. Fazio*, 914 F.2d 950, 955–56 n. 6 (7th Cir. 1990)." D.Ct.Op. at 11. Only Stewart has raised the *Miranda* issue before us.

The legal precepts are most familiar, even to the laity. The Supreme Court has frequently affirmed the central principle established by *Miranda*, namely, if a suspect is taken into custody or otherwise deprived of freedom of action and is questioned without being informed of his *Miranda* rights, his responses may not be introduced into evidence to establish his guilt. *Berkemer v. McCarthy*, 468 U.S. 420, 429, 104 S.Ct. 3138, 3144–45, 82 L.Ed.2d 317 (1984). Because it is conceded that Stewart was not advised of his *Miranda* rights prior to his formal arrest, we must decide whether Stewart was in custody for *Miranda* purposes when Officers Twing and Peregoy questioned him and whether this questioning amounted to interrogation calling for testimonial incrimination.

Thus our inquiry into the circumstances of temporary detention for a Fifth and Sixth Amendment *Miranda* analysis requires a different focus than that for a Fourth Amendment *Terry* stop. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Searches and seizures " 'conducted outside the judicial pro-

cess, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions.'" *Thompson v. Louisiana*, 469 U.S. 17, 19–20, 105 S.Ct. 409, 410, 83 L.Ed.2d 246 (1984) (per curiam) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (footnotes omitted)). *Terry v. Ohio* was one such exception. *See also Adams v. Williams*, 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). For Fourth Amendment purposes, a temporary detention is "permitted without a warrant and on the basis of reasonable suspicion less than probable cause." *Minnesota v. Dickerson*, —— U.S. ——, ——, 113 S.Ct. 2130, 2136, 124 L.Ed.2d 334 (1993). If a search at a temporary detention goes beyond what is necessary, it is no longer valid under *Terry*, and its fruits will be suppressed. *Sibron v. New York*, 392 U.S. 40, 65–66, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968).

The purpose of permitting a temporary detention without probable cause or a warrant is to protect police officers and the general public. *Terry*, 392 U.S. at 25–26, 88 S.Ct. at 1882. Jurisprudentially, we are saying that the temporary seizure of the person is reasonable, and therefore a warrant is not necessary. The stop is reasonable, as we have previously set forth in detail, only when the police have an articulable suspicion that a crime has been, is being, or will be committed, and a number of factors are present which we have discussed in Part IV(B). Reasonableness for Fourth Amendment purposes always depends on a variety of circumstances. *United States v. Sokolow*, 490 U.S. 1, 8–9, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1 (1989).

The purpose of the *Miranda* rule, however, is not to protect the police or the public. "[T]he basis for [the] decision was the need to protect the fairness of the trial . . .," and "[t]here is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment." *Schneckloth v. Bustamonte*, 412 U.S. 218, 240–41, 93 S.Ct. 2041, 2054–55, 36 L.Ed.2d 854 (1973); *see also Withrow v.*

*Williams*, —— U.S. ——, ——, 113 S.Ct. 1745, 1753, 123 L.Ed.2d 407 (1993) ("[I]n protecting a defendant's Fifth Amendment privilege against self-incrimination *Miranda* safeguards 'a fundamental *trial* right.'"). Accordingly, a completely different analysis of the circumstances is required. The inquiry is much narrower. The number of relevant factors is severely limited. Police officers have much less discretion than in Fourth Amendment cases.

The Supreme Court has instructed us that when a temporary detention takes place, *Miranda* becomes applicable whenever "'a person has been taken into custody *or otherwise deprived of his freedom of action in any significant way* . . . .'" *Berkemer v. McCarty*, 468 U.S. 420, 435, 104 S.Ct. 3138, 3148, 82 L.Ed.2d 317 (1984) (quoting *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612). The Court further stated, "It is settled that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.' *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam)." *Id.* 468 U.S. at 440, 104 S.Ct. at 3150. *Berkemer* thus underscores that Fifth and Sixth Amendment rights are implicated before a defendant has been arrested. We now re-examine the uncontroverted facts for two inquiries, and only two: to determine whether Stewart was deprived of his freedom of action in any significant way; and if so, whether he was interrogated so as to elicit an incriminating response.

### A.

■ Prior to Officer Twing's questioning, Stewart had been frisked, placed in handcuffs and told to sit at a specific place on the grass by the side of the road. At that time, the defendants were outnumbered by the police officers. Stewart was not free to go anywhere. His movement was curtailed as if he were handcuffed to a chair in a detective's office or placed in a holding pen in a station house or put behind bars. We have no difficulty in concluding that Stewart's freedom of action was curtailed in a very significant way.

In *New York v. Quarles,* 467 U.S. 649, 655, 104 S.Ct. 2626, 2631, 81 L.Ed.2d 550 (1984), the Court found that the suspect was in custody for purposes of *Miranda* when he was surrounded by at least four police officers and was handcuffed when the questioning took place. The Court observed that, during the questioning, there was nothing to suggest that the officers were concerned for their physical safety. *Id.* Similarly, in this case, there is nothing to suggest that the police were concerned for their physical safety after Stewart was handcuffed. In *United States v. Henley,* 984 F.2d 1040, 1042 (9th Cir.1993), the court held that when a suspect, who had not yet been formally arrested, was handcuffed and placed in the back of a police car, he was in custody for *Miranda* purposes. *Accord United States v. Sangineto–Miranda,* 859 F.2d 1501, 1515 (6th Cir.1988) (suspect was in custody when he was handcuffed and placed in police car).

The facts in *United States v. Fazio,* 914 F.2d 950 (7th Cir.1990), upon which the district court relied in determining that Stewart was not in custody, did not demonstrate the high degree of curtailment present here. The police restrained Fazio only by asking him to sit in a particular office in his own restaurant while they executed a search warrant in an adjacent room. We emphasized, "There is no evidence, however, that Mr. Fazio was locked in the room or physically restrained in any way. He was not handcuffed and never had a gun drawn on him." *Id.* at 955.

Although Stewart had not been told whether he was under arrest, he was removed from the taxicab in which he was riding, separated from his property and his associates and handcuffed. By the time of his arrest, there were a large number of officers at the scene. At least seven officers were present. Under these circumstances, there was sufficient curtailment of Stewart's freedom of action to establish custody for *Miranda* purposes. In holding otherwise, the district court erred.

### B.

We must next determine if Stewart was subjected to an "interrogation," that is, "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) (footnotes omitted).

Initially, we must distinguish between statements that merely give permission to search and those that are self-incriminating.

### 1.

We have held that a consent to search is not a self-incriminating statement and, therefore, a request to search does not amount to interrogation. *Glenna,* 878 F.2d at 971. This view comports with the view taken by every court of appeals to have addressed the issue. *See, e.g., Cody v. Solem,* 755 F.2d 1323, 1330 (8th Cir.) ("Simply put, a consent to search is not an incriminating statement. [The suspect's] consent, in and of itself, is not evidence which tends to incriminate him. While the search taken pursuant to that consent disclosed incriminating evidence, this evidence is real and physical, not testimonial."), *cert. denied,* 474 U.S. 833, 106 S.Ct. 104, 88 L.Ed.2d 84 (1985); *Smith v. Wainwright,* 581 F.2d 1149, 1152 (5th Cir.1978) ("A consent to search is not a self-incriminating statement; '[i]t is not in itself evidence of a testimonial or communicative nature' ") (quoting *United States v. Lemon,* 550 F.2d 467, 472 (9th Cir.1977)).

### 2.

Where the question goes beyond a request for consent and inquires as to ownership of that which is searched, the inquiry crosses the threshold into testimonial incrimination and is therefore barred unless the safeguards of *Miranda* have been put in place. *United States v. Monzon,* 869 F.2d 338, 342 (7th Cir.) (officer's question regarding ownership of car was likely to elicit incriminating response and cannot be asked absent *Miranda* warnings), *cert. denied,* 490 U.S. 1075, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989); *United States v. Henley,* 984 F.2d 1040, 1043 (9th Cir.1993) (inquiry regarding defendant's ownership of vehicle called for

testimonial answer, because agent should have known that his question was likely to elicit incriminating response).

■ Officer Twing did not limit his questioning of Stewart to a request to search Stewart's duffle bag, but instead asked him to identify which bag in the cab was his. This situation presents the same concerns that were before the Court of Appeals for the Ninth Circuit in *Henley*. Involved there was ownership of a car used in a getaway; involved here was ownership of a bag containing incriminating evidence of a drug conspiracy.

Twing and his colleagues did not know who owned the various bags located in the trunk of the taxi, and Twing was seeking evidence that had the very real capacity to incriminate. Thus, Twing should have known that the question would elicit an incriminating response.

The interrogation of Stewart did not end after he admitted ownership of a bag containing drug paraphernalia. Prior to the police announcing that the defendants were officially under arrest, Officer Peregoy asked Stewart about events that took place at the Travelodge motel. The magistrate judge found as an uncontroverted fact:

> Peregoy's surveillance room was across from Room 239. As he was en route to the room, Peregoy encountered a black male who came out of Room 224 and entered Room 239. This turned out to be defendant Stewart, who was registered to Room 239, although Peregoy did not know it at the time.

R. 167 at 5 (citations omitted). Peregoy asked Stewart if he remembered Peregoy from the motel hallway. Clearly, Peregoy hoped to connect Stewart and the other detainees to the activity conducted at the Travelodge. This question was not only likely to produce an incriminating testimonial response, it was so intended. Stewart was entitled to be told of his *Miranda* rights before either question was asked.

Under these circumstances, we conclude that Stewart's statements should not have been considered by the district court in the suppression hearing. Accordingly, we will vacate the sentence entered on Stewart's conditional guilty plea and remand this case to permit him to withdraw his guilty plea and obtain a new suppression hearing as to his motion only.

## VI.

■ The amount of drugs involved in a conspiracy must be proved by a preponderance of the evidence. *United States v. Price,* 988 F.2d 712, 720 (7th Cir.1993). In a drug conspiracy, each conspirator is not only responsible for the amount of drugs he actually distributed but also for the amount involved in transactions by co-conspirators and reasonably foreseeable by him. *United States v. Goines,* 988 F.2d 750, 775 (7th Cir.1993).

■ The district court found that cocaine base totalling 107.65 grams was attributable to Stewart and Taylor and 103.54 grams to Smith. The district court found that the following facts were established by a preponderance of evidence:

1. All five defendants were members of the same Chicago street gang, and all five had travelled from Chicago to Madison on August 17, 1990.

2. All five were in Madison, initially in two separate groups to sell cocaine base.

3. Taylor and Stewart came to Madison with at least 45 grams of cocaine base to sell, and Taylor had 35.30 grams of cocaine base on his person.

4. The Hall–Smith–Blanchard group had 62.65 grams of cocaine base with them.

5. Stewart and Taylor moved their base of illegal drug activity from another motel to the same motel in which the other three were staying.

6. The five defendants then pooled their efforts and decided to continue their operation together.

7. The five defendants decided jointly to leave at the same time in the same cab, and they further agreed to return at a later date when customers would be more plentiful.

The district court concluded that all five defendants were involved in a single conspiracy

to sell cocaine base. The court relied in part upon the sworn testimony of co-defendants Hall and Stewart. Stewart and Taylor argue that the use of this testimony was improper, because they were not able to cross-examine Hall, and they were not advised that the court would consider this testimony.

Under the sentencing guidelines, the Federal Rules of Evidence do not apply to sentencing hearings, "although the 'evidence' that the judge does rely on in sentencing the defendant must be reasonably reliable." *United States v. Morales,* 994 F.2d 386, 389 (7th Cir.1993). Hearsay is not only an acceptable basis for a sentencing determination, it is an "integral part of the sentencing process." *United States v. Badger,* 983 F.2d 1443, 1459 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2391, 124 L.Ed.2d 293 (1993).

In *Badger,* we held that a defendant "does not possess a constitutional right to cross examine a person who provided the government with information that was later used during sentencing." *Id.* at 1459. However, in *United States v. Campbell,* 985 F.2d 341, 348 (7th Cir.1993), we noted that a defendant "has a due process right to be sentenced on the basis of reliable information." Thus, we "insist[ed] that a defendant have a reasonable opportunity to rebut contested hearsay and that contested hearsay be reliable." *Id.* "Only if a defendant 'show[s] that the information before the court was inaccurate, and that the court relied on it' can the defendant successfully challenge his sentence." *United States v. Johnson,* 997 F.2d 248, 254 (7th Cir.1993) (quoting *United States v. Musa,* 946 F.2d 1297, 1306 (7th Cir.1991)). Moreover, we give "great deference to the district court's determination that the hearsay is worthy of credence, and will review that ruling only for an abuse of discretion." *Campbell,* 985 F.2d at 348.

The district court apparently found that the testimony of Hall was reliable because he testified under oath at his guilty plea hearing and that his testimony was substantially cor-

roborated by the reports of the case agents and the facts surrounding the arrest. We will not disturb the findings of the sentencing court as to Taylor. For the reasons previously discussed, Stewart's sentence will be vacated.

### VII.

The judgments of the district court as to appellants Smith and Taylor are AFFIRMED. The sentence as to appellant Stewart is VACATED and the cause as to him REMANDED for the purpose of his withdrawing his plea, if desired, and for a new suppression hearing, if requested, in accordance with the foregoing.