107 F.3d 874
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert D. SINGLER, Defendant-Appellant.
 No. 96-2859.
 United States Court of Appeals, Seventh Circuit.
 Argued Dec. 17, 1996.
Decided Feb. 06, 1997.
 
 Before COFFEY, FLAUM and EVANS, Circuit Judges.
 
 ORDER
 
 1
 Robert D. Singler pleaded guilty conditionally to being a felon in possession of a firearm pursuant to 18 U.S.C. § 922(g)(1), reserving the right to appeal the district court's denial of his motion to suppress. The district court had conducted a suppression hearing, concluding that Singler was not subjected to custodial interrogation and his self-incriminating statements at issue were admissible and thus the search warrant based upon these statements was properly obtained. The district court also concluded that the degree of restraint on Singler's freedom during his initial encounter with the police was reasonable under Terry v. Ohio, 392 U.S. 1 (1968). Singler asserts that the district court erred in denying his motion to suppress statements and evidence based on an improper custodial interrogation and Terry stop. For the reasons set forth below, we affirm the district court.
 
 BACKGROUND
 
 2
 The South Central Illinois Drug Task Force conducted a field surveillance on property belonging to Singler's father, Kenneth Singler, after aerial photographs revealed a cultivated cannabis plot on the property. Kenneth Singler's property was in a rural area and contained horses, a barn, a pond and creek, yet no farmhouse or residence. On the third day of their surveillance, three agents were positioned in some brush and observed Robert Singler walking close to the cannabis plants after he had been working and fishing on his father's property for approximately two hours. Singler's proximity to the cannabis plants is disputed, ranging anywhere from 15 feet to 40 yards, and the plants were approximately six feet high. Shortly thereafter, Singler's dog alerted him to the agents, who then identified themselves and advised him that they were conducting an investigation of the cannabis plot of which Singler denied any knowledge. Testimony indicates that Singler did admit that he had grown marijuana plants in the past, but he had not grown any for some time.
 
 
 3
 Singler testified at the suppression hearing that the three agents surrounded him and that he immediately put his hands in the air. Singler was not handcuffed at this time, and he admitted that the agents never told him he was under arrest. In fact the evidence indicates that the officers advised Singler that he was not under arrest.[1] Although Singler was unsure if two of the agents were armed, he testified that one of the officers had his gun drawn. One of the officers refuted this statement, testifying that none of the officers drew their guns during their encounter with Singler at any time.
 
 
 4
 The agents then engaged Singler in a discussion, including whether he would be willing to inform them of any individuals linked to the cannabis plots. Singler testified that Sergeant Kettlekamp, who he knew personally, told him that if he acted as an informant he would be able to go to work in the morning as if nothing had happened. Additionally, Singler testified that the officers said that his cooperation would be made known to the State's Attorney's Office in that county. Singler cooperated with the agents and gave them some information including a few names. Further testimony indicates that during the encounter with the officers, Singler paced around as far as 35 to 40 feet away from the officers.
 
 
 5
 At this time an officer asked Singler if they could conduct a search of his residence, which was approximately six or seven miles from his father's property. Agent Kettlekamp testified that Singler stated that he would not mind the search, but that the agents would "find the bag of pot and the guns in my house, and that I'm not supposed to have guns in my house because I'm a convicted felon." Singler testified that he gave the officers this information to be honest with them so when they found the guns they would not grab and throw him down. This initial conversation lasted approximately ten minutes.
 
 
 6
 After the initial conversation, Singler walked back to his truck with an agent and discovered that his vehicle had been searched and some knives were removed from the cab of his truck and placed on the tailgate. An investigative agent, who participated in the surveillance operation, testified that due to Singler's prior history of violent behavior, including Singler's two previous aggravated battery convictions against police officers, he searched the truck for the safety of the officers. After discovering that his truck had been searched, Singler became angry, belligerent, and punched the sides of his truck. He grabbed a beer from a cooler in his truck and eventually calmed down after drinking some beer. The agents then allowed him to drive the six or seven miles back to his house alone while they followed.
 
 
 7
 During the trip to Singler's house, the agents determined that they had probable cause to arrest Singler for being a felon in possession of a firearm and for possession with intent to deliver cannabis. Upon arriving at Singler's house, the agents arrested Singler and handcuffed him. Singler was not given his Miranda warnings prior to his arrest.
 
 
 8
 After his arrest, the officers again asked Singler if they could search his house. He refused to consent so the agents obtained a search warrant, based solely on Singler's incriminating statements. At Singler's residence, the agents recovered three cannabis plants, approximately two ounces of cannabis, drug paraphernalia, and three firearms, including a loaded High Standard .22 caliber semi-automatic pistol. The firearms found formed the basis of Singler's indictment of being a felon in possession of a firearm. Singler testified that at no time during any of these encounters with the agents did he feel free to leave, nor did the agents advise him that he was free to leave. The entire encounter between the agents and Singler lasted no longer than 30 minutes.
 
 
 9
 In the district court, Singler moved to suppress all the statements made to the agents and all the evidence obtained pursuant to the search warrant based on his incriminating statements. Singler claimed that he was in custody and that the police inquiries constituted interrogation; thus, his statements were inadmissible in court due to the lack of Miranda warnings. Singler also asserted that the police lacked sufficient cause to stop him on his father's property in the first instance.
 
 
 10
 The district court found that the agents had sufficient justification to detain and question Singler under Terry v. Ohio, 392 U.S. 1 (1968). The court also concluded that Singler was not in custody, nor was he interrogated; therefore, his incriminating statements were admissible. Singler appeals.
 
 STANDARD OF REVIEW
 
 11
 The issue of whether a defendant is "in custody" is a mixed question of fact and law and is thus subject to independent review. Thompson v. Keohane, 116 S.Ct. 457, 465 (1995) (in the context of habeas review); Sprosty v. Buchler, 79 F.3d 635, 640 (7th Cir.), cert. denied, 117 S.Ct. 150 (1996). Additionally, in Ornelas v. United States, 116 S.Ct. 1657, 1663 (1996), the Supreme Court held "that as a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal." Partially based on these two opinions, this court re-affirmed its holding in United States v. Hocking, 860 F.2d 769 (7th Cir.1988), that appellate review of a district court's determination of "custodial interrogation" is de novo. United States v. Yusuff, 96 F.3d 982, 988 (7th Cir.1996). Yusuff notes, however, that "historical" facts and credibility determinations are reviewed deferentially.[2] Id. Also, the Supreme Court articulated that "a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Ornelas, 116 S.Ct. at 1663.
 
 DISCUSSION
 A. TERRY STOP
 
 12
 Singler claims that the agents did not have sufficient justification to detain and question him on his father's property in the first instance under Terry v. Ohio, 392 U.S. 1 (1968). Terry stops are investigative and brief, allowing police officers a chance to verify suspicions that the person has been, is, or is about to engage in criminal activity. United States v. Boden, 854 F.2d 983, 992 (7th Cir.1988). A Terry stop is less restrictive than an arrest and is therefore permissible on a showing of reasonable suspicion, rather than the higher burden of proof that of probable cause. United States v. Smith, 3 F.3d 1088, 1095 (7th Cir.1993), cert. denied, 510 U.S. 1061 (1994). To determine whether an officer's suspicion of criminal activity is reasonable, the standard applied is that of the totality of the circumstances test. Boden, 854 F.2d at 992. The investigation following a Terry stop "must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests." United States v. Robinson, 30 F.3d 774, 784 (7th Cir.1994). If a Terry stop continues for an excessive period or an unreasonably long period of time or becomes unreasonably intrusive, it becomes a de facto arrest and must be based on probable cause. Id. Factors used to determine the distinction between a Terry stop and an arrest include the officers' intent, length of stop, questions asked, impressions conveyed, and any search made. Smith, 3 F.3d at 1095-96. Pursuant to a valid Terry stop, officers may conduct a reasonable search for weapons to protect themselves if they have reason to believe that the suspect may be armed and dangerous. Terry, 392 U.S. at 27.
 
 
 13
 Singler summarily challenges the agents' investigative stop as impermissible under Terry because: (1) a reasonable person would have felt that he was not free to leave; (2) the officers elicited incriminating responses; (3) the encounter was intrusive because the officers searched Singler's truck and asked to search Singler's home. However, Singler does not substantiate or develop these assertions in his appellate brief, but argues that the government was conducting an unlawful warrantless search by trespassing on his father's property and that this should be considered under the totality of the circumstances. His explanation was that a reasonable person would have assumed that three agents would not be on his father's property without a warrant.[3]
 
 
 14
 The government argues that the encounter with Singler is supported by specific and articulable facts and thus proper under Terry. The government asserts that their judgment was supported by the information they had gleaned from their observation during the surveillance and their interview with him, as well as their investigation. Specifically, the government contends that through their observation of Singler moving about on the property for two hours and then walking toward the cannabis plants, along with the rational inferences from those facts, they had reasonable suspicion. The government also contends that not only was the stop proper under Terry, but because Singler's activities were conducted in open fields, the agents entering the property was reasonable under the Fourth Amendment. See Oliver v. United States, 466 U.S. 170, 177 (1984).
 
 
 15
 Although this court reviews the district court's determination of reasonable suspicion de novo, the lower court's factual findings and credibility determinations are reviewed deferentially. See Ornelas, 116 S.Ct. at 1663; Yusuff, 96 F.3d at 988. The district court concluded that the police had "reasonable and articulable suspicion" that Singler was involved in an illegal activity due to the proximity of Singler to the cannabis plants. Relying on Smith, 3 F.3d at 1095, the district court found that the initial encounter with Singler was proper based on the officers' knowledge that cannabis was being cultivated on the property, as well as the fact that Singler had been on the property for approximately two hours and they were of the opinion that he was connected with the activities being conducted there. Although Singler's proximity to the cannabis plants is disputed by Singler and the agents as being anywhere from 15 feet to 40 yards, the district court concluded that his proximity and his walking directly toward the cannabis plants supported the investigative stop.
 
 
 16
 Guided by Robinson, 30 F.3d at 784, the district court also concluded that the investigative stop was reasonably related in scope and duration to the circumstances justifying the stop. Specifically, the district court found that the entire encounter lasted but 30 minutes and that the degree of restraint imposed by the agents throughout the encounter was low. The district court also notes that the only search prior to the arrest was that of the truck's cab at which time they found the knives. The district court also noted that as the encounter continued, the degree of suspicion increased and that the agents had probable cause within about ten minutes of the encounter.
 
 
 17
 We agree with the district court and conclude that there was sufficient justification for the officers to participate in a Terry stop to investigate Singler. The officers' investigation of the cannabis plots, in tandem with Singler's activities on the property, gave rise to reasonable suspicion to verify or dispel whether Singler was involved in the cultivation of the cannabis plots. Additionally, the officers' subsequent questioning was related to the cannabis plots in scope and duration, as the officers asked questions about who cultivated the plots and the conversation lasted only ten minutes. Testimony also indicates that Singler's freedom to move was not restrained and he was free to move about, as he paced 35 to 40 feet from the officers. During the interview, Singler told the officers that he had grown marijuana in the past, conveying the impression that he could be involved with the cannabis plot in question.
 
 
 18
 Last, after reviewing the testimony of the suppression hearing, we conclude that the search of the truck was not unreasonable based on the circumstances. From the evidence it is clear that the investigative agent searched the truck for the safety of the officers based on Singler's prior history of violent behavior, including convictions of aggravated battery against law enforcement personnel. See Terry, 392 U.S. at 27.
 
 B. CUSTODIAL INTERROGATION
 
 19
 Singler contends that the agents were required to give Miranda warnings before the discussion that took place on his father's property. In order to protect one's right against self-incrimination, suspects must be advised of certain rights before they are subjected to custodial interrogation. Miranda v. Arizona, 384, U.S. 436, 444 (1966). Miranda warnings are required only if the suspect is "in custody" and subject to "interrogation." United States v. Saadeh, 61 F.3d 510, 519 (7th Cir.), cert. denied, 116 S.Ct. 521 (1995).
 
 
 20
 A suspect is "in custody" when the individual's movement is restrained to the degree associated with a formal arrest. California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam). Whether an individual is "in custody" involves objective circumstances and is not limited to the subjective views held by the officers nor the person being questioned. Stansbury v. California, 114 S.Ct. 1526, 1529 (1994). Thus, this inquiry based on the totality of the circumstances, includes evaluating the length and place of questioning and the suspect's freedom to leave the scene. See Saadeh, 61 F.3d at 519.
 
 
 21
 In addition to express questioning, the term "interrogation" under Miranda includes "any words or actions on the part of the police (other than those normally attendant to arrest or custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Therefore, the test in determining whether the police are interrogating a suspect is "whether a reasonable objective observer would believe that the encounter was 'reasonably likely to elicit an incriminating response from the suspect' and therefore constituted the 'functional equivalent' of interrogation." Killebrew v. Endicott, 992 F.2d 660, 663 (7th Cir.1993) (quoting Innis, 446 U.S. at 300-01).
 
 
 22
 Although this court reviews the district court's determination of custodial interrogation independently, the court must defer to the trial court's findings of historical facts and credibility determinations. See Ornelas, 116 S.Ct. at 1663; Yusuff, 96 F.3d at 988. The district court concluded that Singler was neither in custody, nor interrogated when questioned by the agents, as the court found that during the entire 30 minute encounter, Singler was free to move about and was neither handcuffed nor physically restrained. In addition, the district court concluded that even after Singler became angry and belligerent due to the search of his truck, the police did not arrest, handcuff, or subdue him, although his behavior was threatening. The district court also reasoned that the conversation that led to the self-incriminating statement did not amount to interrogation because the police inquiry did not probe for incriminating answers.
 
 
 23
 We agree with the district court and conclude that Singler was not "in custody", nor "interrogated" when he made the incriminating statements. The key to this court's conclusion that Singler was not in custody is the fact that the agents allowed him to drive the six or seven miles back to his house alone, even after his outburst. Officer Kettlekamp's testimony indicates that it is uncommon to allow an arrested suspect to drive their own vehicle. This fact combined with the other circumstances of the encounter recited above convinced the trial judge that Singler was not under police control, and was free to leave.
 
 
 24
 Additional factors in support of the conclusion that Singler was not in custody include that Singler was not handcuffed and he admitted he was never advised he was under arrest until the formal arrest at his home. Additionally, Officer Kettlekamp's affidavit attached to the Government's Response to Defendant's Motion to Suppress Evidence clearly states that the officers advised Singler that he was not under arrest. In light of the totality of the circumstances surrounding this encounter, a reasonable person in the defendant's position would not believe he or she was in custody. We are unconvinced that just because Singler thought or claims he was in custody that he was in custody, as subjective belief is not a factor in our analysis. See Stansbury, 463 U.S. at 1529.
 
 
 25
 Singler was not interrogated, either. The testimony falls short of convincing us that the officers were asking questions to elicit incriminating responses, but were asking Singler to cooperate in their investigation by linking other suspects to the cannabis plots. At the suppression hearing, Officer Kettlekamp testified that when asked if Singler would give consent to search his house, Singler made the self-incriminating statement that he would not mind the search, but that the agents would "find the bag of pot and the guns in my house, and that I'm not supposed to have guns in my house because I'm a convicted felon." There is no indication that the agents were trying to elicit this type of response from Singler, but that this information was volunteered freely. A request for consent to search is not likely to elicit incriminating statements and thus such questioning is not interrogation. United States v. LaGrone, 43 F.3d 332, 335 (7th Cir.1994). In sum, we conclude that the officers' questioning was not the "functional equivalent" of interrogation.
 
 CONCLUSION
 
 26
 The agents had reasonable suspicion to stop Singler on his father's property and the scope and duration of the police questioning was justified due to their observation of Singler's activities on the property. Second, Singler was not in custody when he made the statements about the firearms and marijuana in his home because he was not restrained to the degree associated with a formal arrest. Last, the encounter with the police was not interrogation, as the inquiries were not of the kind which would lead to incriminating responses, but was information freely given.
 
 
 27
 AFFIRMED.
 
 
 
 [1]
 See Affidavit of Bruce A. Kettlekamp p 4, attached to Government's Response to Defendant's Motion to Suppress Evidence
 
 
 [2]
 The Yusuff panel also noted that in United States v. Saadeh, 61 F.3d 510, 519 (7th Cir.1995), this court "stated that the district court's determination that Miranda warnings were not necessary was subject to clear error review." United States v. Yusuff, 96 F.3d 982, 987 n. 5 (7th Cir.1995). Yusuff distinguishes Saadeh in that it failed to mention the United States v. Hocking, 860 F.2d 769 (7th Cir.1988) line of cases
 
 
 [3]
 It is questionable whether Robert Singler would have standing to assert the claim that the government was conducting an unlawful search on his father's property because he was not the owner of the property. See United States v. Kramer, 711 F.2d 789, 792-93 (7th Cir.), cert. denied, 464 U.S. 962 (1983) (Fourth Amendment accords people protection of their property). Further, Singler does not substantiate this argument