**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Razaq K. OWOLABI, Defendant–
Appellant.**

No. 94–3551.

United States Court of Appeals,
Seventh Circuit.

Argued April 6, 1995.

Decided Oct. 27, 1995.

Barry Rand Elden, Chief of Appeals, Charles Ex, argued, Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Scott J. Frankel, Frankel & Cohen, Chicago, IL, for Defendant–Appellant.

Before BAUER, COFFEY and FLAUM, Circuit Judges.

COFFEY, Circuit Judge.

On October 8, 1993, a criminal complaint was filed against Razaq Kolade Owolabi, a Nigerian citizen, charging him with transporting counterfeit and forged securities in violation of 18 U.S.C. § 2314. On October 13, Owolabi was brought before a magistrate for a preliminary detention hearing, at which the magistrate determined that there was probable cause to believe that Owolabi committed the crime charged, and ordered that he remain in custody pending trial.

In September 1993, a grand jury returned a two-count indictment against the defendant, and in May 1994, the grand jury returned a superseding three-count indictment against him, and in Count One, he was charged with illegal reentry into the United States after deportation[1] in violation of 8 U.S.C. § 1326. In Count Two, he was charged with possession of a counterfeit United States Treasury check in violation of 18 U.S.C. § 472; and in Count Three, he was charged with possession of counterfeit securities of private entities in violation of 18 U.S.C. § 513.

The defendant filed a motion to suppress the evidence, alleging illegal seizure. The district court, upon review, agreed with the magistrate's denial of the motion[2] and Owolabi entered a plea of guilty to the three counts in the superseding indictment. His counterfeiting offenses were grouped according to the multiple-count adjustment formula, U.S.S.G. § 3D1.2,[3] yielding an offense level of 18, and two points were added for his illegal re-entry, pursuant to U.S.S.G. § 3D1.4(a).[4] After a three point reduction for acceptance of responsibility, the defendant's adjusted offense level was 17. Combined with his criminal history of VI,[5] the sentencing guidelines yielded an imprisonment range of 37 to 46 months and the trial judge sentenced Owolabi in the middle of the range, ordering him to serve a term of 41 months of imprisonment, to be followed by three years of supervised release, and further ordered him to pay a special assessment of $150. Owolabi appeals the calculation of his sentence. We AFFIRM.

## I. BACKGROUND

On October 7, 1993, Razaq Owolabi took a flight from Nigeria to Amsterdam. He had planned to fly from Amsterdam to Montreal, Canada, but was denied boarding the flight to Canada because he did not possess "the proper documents to enter Canada." Shortly thereafter, Owolabi was able to purchase a ticket to Chicago, Illinois, claiming that he was a lawful resident of the United States, but he had lost his United States Resident Alien Card ("green card").

When Owolabi arrived at Chicago's O'Hare International Airport, he was routed to a customs inspection area where a customs agent, Jim Stewart, questioned him concerning his citizenship and his travel plans in the United States. The defendant told Stewart that he was a lawful resident of the United States, but had lost his green card, and that he was going to visit a friend in Chicago, who resided at 350 North Sheridan, an address that was later discovered to be fictitious.

The defendant was carrying one piece of hand-held luggage, which Stewart proceeded to examine, pursuant to his authority under 19 C.F.R. § 162.6.[6] According to the government, in its response to Owolabi's motion to suppress, Stewart observed that during the inspection of the bag's contents, Owolabi "was visibly nervous." During the search, Stewart discovered three checks under a cushion insert in one of Owolabi's shoes in his

---

1. Owolabi was deported in July 1993, after being found guilty of bank fraud and uttering a counterfeit obligation in violation of 18 U.S.C. §§ 1344 and 513.

2. The magistrate heard the motion to suppress pursuant to the authority conferred in 28 U.S.C. § 636(b)(1).

3. *See, infra,* section III. C.

4. *See, infra,* section II.

5. *See, infra,* footnote 14.

6. 19 C.F.R. § 162.6 provides that: "All persons, baggage, and merchandise arriving in the Customs territory of the United States from places outside thereof are liable to inspections and search by a Customs officer."

bag, issued by Baltimore International Bank, each for $15,000. Closer scrutiny of the checks revealed that all three were identical, bearing the same amount, the same check number, and were blank as to the payee. When questioned about these checks, Owolabi told the customs inspector that he was a used car salesperson in Nigeria, that his boss had signed the checks, and directed him to bring them to the United States, and that his employer was going to meet him in New York in two weeks. When the agent inquired of Owolabi as to why his boss did not simply bring the checks to the United States himself, Owolabi had no answer and became even more nervous.

At this point, Owolabi, not yet under arrest, was escorted by Stewart to a private room where the agent conducted a pat-down search, pursuant to 19 C.F.R. § 162.6, as well as requesting that he remove his shoes, lower his pants, and raise his shirt. Owolabi complied with the agent's requests. At this time, Stewart discovered fourteen additional checks, ranging in amounts from $15,000 to $68,300, in the shoes Owolabi was wearing. Thirteen of the checks were drawn on a variety of private institutions, and a number of them had no designated payee nor any dates inscribed thereon. The other check was a United States Treasury check in the amount of $22,700, made payable to a person the defendant claimed was his employer. When questioned about the checks, the defendant stated that several of them represented his boss' proceeds from sales of cars, and that the Treasury check was his employer's income tax refund check.

Stewart called Robert C. Daniel, a Special Agent with the Federal Bureau of Investigation assigned to the O'Hare Airport, and informed him that Owolabi was being detained on suspicion of entering the United States with counterfeit checks. Daniel arranged to meet with Stewart, examined the checks, and agreed that they appeared suspicious. When the two men spoke with Owolabi, he refused to answer any questions about the checks. He was then arrested by Agent Daniel for transporting counterfeit and forged securities, and was read his *Miranda* rights.

After informing the defendant of his rights, Daniel and Stewart also questioned Owolabi about his immigration status and he once again stated that he was a resident alien and had lost his green card. FBI Agent Daniel took Owolabi's personal effects into his possession, including two blank driver's licenses, one from Florida and one from Texas, a Nigerian passport which bore the name Razaq Kolade Owolabi, as well as a letter from a magistrate and a police report, both of which the defendant was using as a substitute for a green card.[7] As part of the identification procedure, Owolabi was interviewed, photographed, and fingerprinted, and the prints were faxed to the FBI's Identification Division.[8] The night Owolabi was arrested, Daniels also displayed the Treasury Check to Sam Shaus, a Secret Service Agent at O'Hare. Shaus concluded that "the check appeared to be counterfeit, as the paper, color, type face of the entries on the check, ... among other features of the check, differed from those of genuine Treasury Department checks."[9]

Before Owolabi's detention hearing, Daniels received a report from the FBI indicating that Owolabi's prints matched those of a man named Babatunde Adekola Albert. The FBI ran a criminal history search using Al-

---

7. The record reflects neither the substance nor the contents of the magistrate's letter or the police report.

8. Agent Daniel testified at the defendant's detention hearing that the blank licenses made him suspect that Owolabi was being less than forthcoming about his true identity.

9. While Daniels was waiting for confirmation of Owolabi's identification, he investigated some of the defendant's checks. Daniels testified that he spoke with Moyer Packing Company's vice-president for finance, who informed Daniels that Moy-er had issued a check to a company in Canada with the same number as the one Owolabi possessed, but that payment had been stopped on that check because it was never received by the payee. The payee on the check Owolabi was carrying was not that of the Canadian company, so Daniels was able to confirm that the check found in the defendant's shoe was counterfeit. Daniels also contacted the Presbyterian Church and Allstate Insurance Co., and confirmed that the checks Owolabi had from those institutions were also counterfeit.

bert's name, and found that he had been arrested in Florida in 1991, and in 1992 he pled guilty to bank fraud charges and passing counterfeit checks, and was sentenced to twenty-four months' imprisonment for each offense, to be served concurrently, five years supervised release, and was ordered to pay $177,625 in restitution. Albert/Owolabi was deported to Nigeria on July 13, 1993, upon release from custody, three months prior to his arrest for the instant offenses.

Owolabi was referred to Pretrial Services Officer Renee Rouse for a pre-detention interview, and during the investigation, he told her that he resided in Brooklyn, New York. Rouse also inquired of Owolabi about his past criminal history under the name of Albert, and the defendant denied that he was the same person as the person convicted of bank fraud and passing counterfeit checks in Florida in 1992.

On October 13, 1994, Owolabi appeared before a Magistrate Judge for a detention hearing. During the hearing, Daniels testified that he had the New York FBI office investigate the Brooklyn address given by Owolabi, and was informed that Owolabi's name was not listed anywhere on the doorbells of the apartment complex in which he claimed to reside, and that the superintendent informed the investigating agent that there were no tenants in the building by the name of Owolabi. At the hearing, Owolabi's attorney informed the magistrate that the defendant resided in Brooklyn and was employed in New Jersey as a used car salesperson.

After hearing the testimony of Agent Daniels, the magistrate determined that probable cause existed to believe that Owolabi had in all probability committed the crimes charged and further that Owolabi was a flight risk and ordered his detention pending further information concerning his resident status and legal residence in New York. In doing so, the magistrate stated that "[w]e've got a real obvious risk of flight problem.... No identification links him to New York ...

The fact that he's used different names [*i.e.,* Babatunde Albert] is obviously another significant problem, because we can't be absolutely sure about his record until we know who he really is."

Owolabi filed a motion to reconsider the detention order and the magistrate conducted a second hearing. Owolabi, again though his attorney, informed the court that he lived in New York, but this time gave an address on Staten Island, New York, where his brother resided. His attorney explained that the defendant used to live in Brooklyn, in an apartment paid for by his brother, but that if released, he would reside on Staten Island.

When the magistrate questioned Owolabi about his immigration status, the defendant's attorney told the court that his client had informed him that "his immigration status is legal." The magistrate refused to release Owolabi, but did state that if the defendant could prove that he was in the country legally, and if one of his family members would come to court and would verify that he would live at the Staten Island address, that she would reconsider her detention order.

Owolabi filed a motion to suppress the evidence seized which was denied,[10] and thereafter, he entered a plea of guilty to unlawful reentry into the United States after deportation, possession of a counterfeit United States Treasury check, and possession of counterfeit securities of private organizations. At his plea hearing, Owolabi admitted that he was the same Babatunde Albert who was convicted of uttering counterfeit checks in 1992. He also acknowledged that he had been less than truthful with the magistrate about his immigration status in the United States, and admitted that he was in the country illegally.

Even though the United States Attorney and Owolabi were not able to reach a formal plea agreement, the defendant nevertheless pled guilty to the crimes charged. The district judge conducted a Rule 11 hearing before accepting the defendant's plea and during which he asked the Assistant United

---

**10.** Owolabi argued that the searches of his shoes and person were "unreasonable, intrusive, [and] excessive." The magistrate denied his motion to suppress and issued a report and recommenda-

tion in which she found the searches to be legal. The district court accepted the report and Owolabi does not appeal the denial of his motion to suppress.

States Attorney to explain, on the record, the maximum penalties the defendant faced as to each crime charged. Owolabi was informed that he was confronted with a potential sentence of five years for each of the three charges, or a total of fifteen years if he was ordered to serve them consecutively, a maximum fine of $750,000 could be imposed, and furthermore, the court could impose a term of two to three years of supervised release, and also he would be required to pay a special assessment of $150. Owolabi affirmed that he was aware of his potential sentence and fine. He also stated that he agreed with the government's version of the evidence against him as stated, with the caveat that he reserved the right to challenge the amounts for which some of the checks were drawn.

The district judge accepted the defendant's plea of guilty and found him guilty of illegal reentry into the United States, 8 U.S.C. § 1326, possession of a counterfeit United States Treasury check, 18 U.S.C. § 472, and possession of counterfeit securities of private entities. 18 U.S.C. § 513. The court referred Owolabi's case to the Probation Office for the preparation of a presentence report.

The Probation Officer computed Owolabi's adjusted offense level for the unlawful reentry into the United States charge to be 14, the level of the charge for uttering counterfeit obligations of the United States was 15, and the level for the possession of forged securities charge was 18. All three levels included a two point enhancement for obstruction of justice because:

The defendant provided materially false information to [the] Magistrate Judge dur-

ing his initial appearance on October 8, 1993, stating he was a legal resident of the United States. Additionally, he continued to lie about his 1992 conviction in Florida, stating that he was not the Babatunde Albert who was convicted. He also provided false information to the Pretrial Service officer who was conducting the pretrial bond investigation. The above behavior constitutes obstruction of justice as defined in guideline 3C1.1, Application Note 3(g).

The probation officer grouped the offenses of uttering counterfeit obligations of the United States and possession of forged securities according to the multiple-count adjustment formula of U.S.S.G. § 3D1.2,[11] and assessed the combined offense level of the counterfeiting crimes at 18. Two additional points were added for the illegal reentry count pursuant to U.S.S.G. § 3D1.4(a).[12] Owolabi filed objections to the presentence report, arguing that his offense level should not be enhanced for obstruction of justice, see, infra, Section III, B, that all three of his offenses should have been grouped together, see, infra, Section III, C, which would have resulted in a two point decrease in his offense level, and that he should have been granted a three point reduction in his offense level for acceptance of responsibility. U.S.S.G. § 3E1.1. He did not contest any of the facts of the offense as set forth by the U.S. Attorney for the court.

The trial judge found that the Probation Officer's calculation of the adjusted offense levels was proper, Owolabi's offenses were grouped appropriately, and that an enhancement for obstruction of justice was warranted, resulting in an offense level of 20. Owo-

**11.** U.S.S.G. § 3D1.2 provides, in relevant part:

All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:
(a) When counts involve the same victim and the same act or transaction.
(b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.
See Section III. C., infra, for a complete discussion of the application of this provision.

**12.** U.S.S.G. § 3D1.4(a) provides:

The combined offense level is determined by taking the offense level applicable to the Group with the highest level and increasing that offense level by the amount indicated in the following table:
* * * * * *
2 [units] ... add 2 levels
* * * * * *
(a) Count as one Unit the Group with the highest offense level. Count one additional Unit for each Group that is equally serious or from 1 to 4 levels less serious.
The illegal reentry offense level was four levels less serious than the possession of forged securities offense level.

labi requested a three-level reduction for acceptance of responsibility because he pled guilty to his crimes, and the district court acquiesced to his request, and adjusted Owolabi's offense level downward to 17. Owolabi's offense level, combined with his criminal history category of IV[13] yielded a 37 to 46 month imprisonment range. The defendant was sentenced in the middle of the range, to 41 months imprisonment, to be followed by three years supervised release, and ordered to pay a special assessment of $150. Owolabi filed a timely notice of appeal.

## II. ISSUES

Owolabi raises the following issues for review: (1) whether the district court committed error when it determined that he obstructed justice by representing to the magistrate that he was legally in the United States and resided in New York, and when he denied to the Pretrial Services Officer that he had been found guilty of the crimes of bank fraud and passing counterfeit checks under the name of Babatunde Albert; and (2) whether the district judge erred when he refused to group all three of the counts to which he pled guilty according to the multiple count adjustment formula of U.S.S.G. § 3D1.2.

## III. DISCUSSION

### A. STANDARD OF REVIEW

We review the district court's "factual determinations underlying the application of the guidelines" for clear error. *United States v. Ritsema*, 31 F.3d 559, 564 (7th Cir.1994) (citation omitted). "[A] factfinder's choice between two permissible choices cannot be clearly erroneous." *United States v. Francis*, 39 F.3d 803, 812 (7th Cir.1994) (citing *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985)). Questions involving the interpretation of the Guidelines are subject to *de novo* review. *Ritsema*, 31 F.3d at 564.

### B. OBSTRUCTION OF JUSTICE

Owolabi's first contention on appeal is that he was improperly assessed an enhancement for obstruction of justice. In support of his argument, the defendant avers that his Fifth Amendment privilege against self-incrimination was violated because he stood silent at his detention hearing before the magistrate, and "never lied about his identity [or immigration status] in the instant proceedings against him." Owolabi also claims that although he denied that he was Babatunde Albert to the Pretrial Services Officer, his misrepresentation did not "interfere or delay the outcome of the investigation against him, nor did his statements or actions substantially affect the outcome of the case." He continues his argument stating that the government was still able to obtain all the relevant information about his deportation and criminal history, he never denied that he was deported under another name, and he admitted all the facts concerning his guilt in the instant case.

The government responds that during the detention hearing, Owolabi may not have spoken, but he stood idly by while he heard his attorney, based upon information given to him by his client, misrepresent his immigration status to the magistrate in furtherance of the defendant's attempt to be released on bail based upon false information.[14] The government also argues that Owolabi's lack of success at impeding the investigation into his criminal history is irrelevant; the government must establish only that the defendant attempted to obstruct justice, not that he actually succeeded in doing so. Owolabi provided materially false information to the Pretrial Services Officer about his name, ad-

---

**13.** In 1988, Owolabi was convicted of petty theft, resisting without violence, unauthorized possession of a driver's license, and a worthless check felony, for a total of two criminal history points. In 1991, he was convicted of bank fraud and uttering counterfeit checks, which yielded three criminal history points. Because he was on supervised release at the time he committed the instant offenses, he was assessed an additional two points, for a total of seven and a criminal history category of IV.

**14.** The record before us reflects that Owolabi informed his attorney that he was a resident alien of the United States and we have no reason to believe that Owolabi's attorney knew that the information his client provided was false.

dress, previous convictions and immigration status, and thus, deserves an enhancement for obstruction of justice.

The district court agreed with the government, finding:

The simple thing ... is that he's trying to get himself released and he's not being totally candid, and I think it would be characterized as that he in fact was concealing information that was pertinent to the determination on detention. And in my view, that fits the definition of obstruction, and that enhancement is properly applicable to this case.

The sentencing guidelines provide for a two level increase in a defendant's offense level "[i]f the defendant willfully obstructed or impeded, or *attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense."* U.S.S.G. § 3C1.1. The Sentencing Commission provided a list of examples of the types of conduct which merit an enhancement, *id.* at Application Note 3, two of which are "providing materially false information to a judge or magistrate," *id.* at (f), and "providing materially false information to a probation officer in the respect to a pre-sentence or other investigation for the court." *Id.* at (h). " 'Material' ... information, as used in this section, means ... information that, if believed, would tend to influence or affect the issue under determination." *Id.* at 5. "Under this section, the defendant is accountable for his own conduct and for conduct that he aided or abetted, counseled, commanded, induced, procured, or willfully caused." *Id.* at 7.

"First, it is well-settled in this Circuit that the denial of one's criminal record to the probation officer preparing the presentence report is most certainly material." *United States v. Rogers,* 45 F.3d 1141, 1143 (7th Cir.1995) (citing *United States v. Thomas,* 11 F.3d 1392, 1400–01 (7th Cir.1993)); *see also, United States v. Taylor,* 31 F.3d 459, 467 (7th Cir.1994); *United States v. Delgado,* 936 F.2d 303, 306 (7th Cir.1991), *cert. denied,* 502 U.S. 1074, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992) ("It is difficult to conceive of a more material falsehood than a defendant lying to a probation officer concerning the extent of his criminal record during the pre-sentence investigation"). Similarly, this court has previously held that "providing false information to the pretrial services officer, who was conducting a bail investigation for the court, falls squarely within the" conduct proscribed by the Application Notes to U.S.S.G. § 3C1.1. *United States v. Ojo,* 916 F.2d 388, 393 (7th Cir.1990) (Ojo provided the pre-trial services officer with a false name and withheld information about her prior criminal history).

■ The sentencing judge acted appropriately when he enhanced Owolabi's sentence for obstruction of justice because Application Note 3(h) of U.S.S.G. § 3C1.1 explicitly states that "providing materially false information to a probation officer in respect to a presentence or other investigation for the court" constitutes grounds for an obstruction enhancement and Owolabi actively misrepresented his criminal history to Pre–Trial Services Officer Rouse when he told her he was not the same Babatunde Albert who was convicted of bank fraud and passing counterfeit checks in Florida in 1992. Furthermore, the defendant's failure to give a truthful and accurate account of his prior criminal record was clearly material, because it was relevant to the magistrate's determination concerning whether or not he should be released on bail, and if so, the amount of the bond necessary to ensure his appearance. Owolabi's behavior falls squarely within the conduct proscribed in *Ojo,* 916 F.2d at 393, because he gave false information concerning both his identity as well as his criminal history.

■ The defendant attempts to minimize the seriousness of his behavior claiming that although he denied his prior criminal history, he created no material impediment to the outcome of his case because the government was still able to ascertain that he was previously convicted under an alias. Owolabi's argument fails, however, because Seventh Circuit case law is quite clear that "as a general rule, actual prejudice to the government is not required for an obstruction enhancement because § 3C1.1 calls for an enhancement not only when the defendant has actually obstructed justice but also when the defendant *'attempted to obstruct or impedge'*

the administration of justice." *Francis,* 39 F.3d at 812 (citing *United States v. Stevenson,* 6 F.3d 1262, 1269 (7th Cir.1993); *United States v. Caicedo,* 937 F.2d 1227, 1234 (7th Cir.1991); *United States v. Gaddy,* 909 F.2d 196, 199 (7th Cir.1990); *United States v. Patterson,* 890 F.2d 69, 72 (8th Cir.1989) (emphasis added)). Owolabi may not have succeeded in his attempt to conceal his criminal history from the court, but he did mislead Officer Rouse and caused the government to expend more time, effort, and expense to determine his accurate criminal history. Thus, the enhancement for obstruction of justice was proper even though the government was able to secure Owolabi's criminal record.

■ Application Note 3(f) of § 3C1.1 states that one who provides materially false information to a magistrate, which is what Owolabi did when he acquiesced in and stood idly by as his attorney stated to the court on behalf of the defendant that he was a resident alien of the United States and lived in Brooklyn, New York, is entitled to an enhancement for obstruction of justice. Owolabi's immigration status was material to the magistrate's determination of whether he should be detained, because a person who is illegally in the United States, and facing possible Federal prosecution, is more likely to flee the jurisdiction than a citizen or resident alien, because he is well aware that a conviction for the same will usually result in a prison sentence, to be followed by deportation. Owolabi clearly misrepresented his status in order that he might be released on bail, and thus attempted, once again, to impede the administration of justice.

■ Owolabi asserts that he merely exercised his Fifth Amendment right before the magistrate, but the Supreme Court has stated that "[the Fifth Amendment's privilege against self-incrimination] is fulfilled only when an accused is guaranteed the right to remain silent unless he chooses to speak in the unfettered exercise of his own will." *Rock v. Arkansas,* 483 U.S. 44, 53, 107 S.Ct.

2704, 2710, 97 L.Ed.2d 37 (1987) (alteration in original, quotation omitted). Owolabi most assuredly facilitated the conveying of false information to the court through his counsel and his action in doing so does not qualify as a lawful exercise of his Fifth Amendment privilege against self-incrimination. This court has stated that "[t]raditionally, the defense attorney has been considered the defendant's mouthpiece and therefore able to speak on behalf of his client." *Burnett v. Illinois,* 619 F.2d 668, 671 (7th Cir.), *cert. denied,* 449 U.S. 880, 101 S.Ct. 229, 66 L.Ed.2d 104 (1980). A defendant cannot stand idly by while he hears his attorney provide false information to the court, as Owolabi did, and then claim that he was exercising his Fifth Amendment right. The Applications Notes also encompass such behavior because they provide for an enhancement when the defendant causes or participates in the transmission of false information to the magistrate. U.S.S.G. § 3D1.2, Application Note 7.

In *Taylor,* this court examined a case in which a defendant owned $12,500 in real estate and had $470,000 in cash at his home when he was arrested, yet these assets were omitted from his pre-trial services report. When the magistrate conducting his detention hearing asked Taylor's attorney if the report accurately reflected the defendant's assets, Taylor's counsel, after conferring with his client, answered "Yes, Your Honor." 31 F.3d at 468, n. 3. At this time, the government informed the magistrate of the existence of the real estate and cash. *Id.* at 462, 467.

The sentencing judge enhanced Taylor's offense level for obstruction of justice because of the false information conveyed to the magistrate,[15] and Taylor appealed, "arguing that his right to refrain from self-incrimination protected his misrepresentations to the Magistrate Judge." *Id.* at 467. In affirming the enhancement, we stated that:

> § 3C1.1 cannot be read to abrogate a defendant's Fifth Amendment rights. Had

---

**15.** Although the defendant had also misrepresented the extent of his assets to the Pre–Trial Services officer, the district court found that these falsehoods "were not material because the officer claimed that Taylor's omission of the real estate and that $470,000 in cash did not affect his decision to recommend that Taylor be released on bond." *Taylor,* 31 F.3d at 467–68.

Taylor simply declined to answer the Magistrate Judge's question ... on the grounds that the answer might incriminate him, no enhancement would have been proper. However, Taylor did not simply preserve his right to refrain from self-incrimination, he affirmatively misrepresented the extent of his assets to the Magistrate Judge.

*Id.* at 468. Owolabi's case is no different from Taylor's for both defendants made material misstatements of fact, through their attorneys, to the magistrate at their detention hearings, in their attempts to be released on bail.

Owolabi's pattern of deception began with the initial falsehoods when he told the Customs Agent that he was a resident alien, but had lost his card, and the pattern continued when he was less than truthful with the pretrial services officer concerning his identity and prior criminal history, and when he provided false information, through his attorney, to the magistrate concerning his immigration status. The defendant made material misrepresentations to the court relevant to the determination of whether he was entitled to be released on bail, and if so, how large the bond should be. In our opinion, the defendant's attempts to impede the administration of justice in his case, merit a two-level increase for obstruction of justice and we agree with the trial judge's imposition of the enhancement.

## C.  MULTIPLE COUNT GROUPING

■ Owolabi's second contention is that all three of his offenses should have been grouped together for sentencing purposes, pursuant to the multiple count adjustment formula of U.S.S.G. § 3D1.2, because his attempt to illegally reenter the country was "so intertwined" with the smuggling of counterfeit checks, thus they constituted a single, continuous course of conduct. In other words, he could not have smuggled the checks into the United States had he not entered the country illegally. Additionally, the defendant argues that society as a whole was the victim of both of his crimes and therefore, the offenses should have been grouped according to the multiple count formula.

The government responds that although society was the general victim of Owolabi's crimes, the interests involved in immigration and counterfeiting offenses are quite different in nature, for immigration laws protect the nation's borders and counterfeiting law protect the integrity of securities and currency. Thus, the three offenses should not have been grouped because they did not inflict similar harms.

The district court, in finding that Owolabi's attempt to enter the country illegally should not have been grouped with his counterfeiting offenses, stated:

> If you didn't give it a separate unit, he gets a free ride for entering illegally.... He can come in here illegally and not be a counterfeiter, and that's a separate thing. He doesn't have to get here illegally in order to do these things, and they are as separate as day is from night. And not treating them as such would give him a free ride for reentering this country illegally.

The United States Sentencing Commission recognized that "[s]ome offenses that may be charged in multiple-count indictments are so closely intertwined with other offenses that conviction for them ordinarily would not warrant increasing the guideline range." U.S.S.G. Ch. 3, Pt. D, Introductory Commentary. "In order to limit the significance of the formal charging decision and to prevent multiple punishment for substantially identical offense conduct, [Part D of the Guidelines] provides rules for grouping offenses together." *Id.; see,* U.S.S.G. § 3D1.2, *supra,* note 9; *see also United States v. Brown,* 47 F.3d 198, 202–03 (7th Cir.1995); *United States v. Maggi,* 44 F.3d 478, 481–82 (7th Cir.1995); *United States v. Jackson,* 983 F.2d 757, 772–73 (7th Cir.1993); *United States v. Schweihs,* 971 F.2d 1302, 1320 (7th Cir.1992); *United States v. Bradach,* 949 F.2d 1461, 1464–65 (7th Cir.1991). "A defendant, of course, hopes to group together as many counts as possible to avoid the possible incremental increase in a sentence associated with loss, harm, or other bad effects stemming from related, but ungrouped counts of

conviction." *United States v. Morgano,* 39 F.3d 1358, 1380 (7th Cir.1994), *cert. denied sub nom., Palermo v. United States,* —— U.S. ——, 115 S.Ct. 2559, 132 L.Ed.2d 813 (1995).

■ Owolabi's argument is that his crimes harmed the same victim, *i.e.,* society at large, and that they constituted a continuous course of action. He argues that his behavior falls within the grouping provision of U.S.S.G. § 3D1.2(b) ("When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan"). Owolabi misstates the requirements of § 3D1.2(b), however, because his entire argument is that his crimes were "so intertwined" that they should be considered a common scheme or plan, whereas the accurate Guideline analysis is whether the crimes involved the same victim *and* constituted part of a common scheme or plan.

The term "victim," as used in the guidelines,

> is not intended to include indirect or secondary victims.... For offenses in which there are no identifiable victims (*e.g.,* drug or immigration offenses, where society at large is the victim), the "victim" for purposes of subsections (a) and (b) is the societal interest that is harmed. In such cases, the counts are grouped together when the societal interests that are harmed are closely related.... Ambiguities should be resolved in accordance with the purpose of this section as stated in the lead paragraph, *i.e.,* to identify and group "counts involving substantially the same harm."

U.S.S.G. § 3D1.2, Application Note 2. "[T]he grouping decision [of victimless crimes] is based upon the nature of the interest invaded by each offense." *United States v. Bruder,* 945 F.2d 167, 170 (7th Cir.1991). "Counts involving different victims (or societal harms in the case of 'victimless' crimes) are grouped together only as provided in subsection (c) or (d)." U.S.S.G. § 3D1.2, Background.

We begin our discussion by dispelling Owolabi's contention that his crimes harmed the same victim. Although we agree that society as a whole was the victim of his immigration offenses, the victims of his counterfeiting schemes would have been the financial institutions that suffered a monetary loss when they cashed his counterfeit checks. Furthermore, even though Owolabi's possession of a counterfeit United States Treasury check is an offense against our national currency system, and thus, society as a whole, we still need to examine "the nature of the interest invaded by each offense" to ascertain when it is appropriate to group victimless crimes for sentencing purposes. *Bruder,* 945 F.2d at 170.

"[T]here is a strong societal interest in controlling immigration and in effectively policing our borders," *United States v. Cupa–Guillen,* 34 F.3d 860, 863 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 921, 130 L.Ed.2d 801 (1995), and "8 U.S.C. § 1326 is designed to effectively enforce the immigration laws." *United States v. Baeza–Suchil,* 52 F.3d 898, 900 (10th Cir.1995). We are mindful of the fact that the right to police our borders, and expel immigrants who have been convicted of felonies, is essential to our national security and welfare. The counterfeiting offenses, however, in addition to harming the private financial institutions involved, by depriving them of their money, interfere with the flow of valid currency and interstate commerce. Our counterfeiting laws are designed to protect the integrity of the Federal Reserve system and its regulation of the national economy. Thus, the societal interests involved in Owolabi's crimes, policing our national borders and protecting our interstate flow of currency, were not the same.

We also note that our holding is consistent with the Second Circuit, which examined the issue of whether counterfeiting and immigration offenses should be grouped according to the multiple count adjustment formula, and held that the "interests protected by the immigration laws and the currency laws are so distinct that it is not realistic to consider both offenses to have as a common 'victim' the United States." *United States v. Kim,* 896 F.2d 678, 687 (2nd Cir.1990).

While Owolabi also tries to persuade us that all three of his crimes should have been

grouped because they occurred simultaneously, this court has previously held that "the fact that an offense may have been committed for the purpose of facilitating another offense does not necessarily mean that the offense cannot have its own separate victim." *United States v. Brown,* 14 F.3d 337, 341 (7th Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 164, 130 L.Ed.2d 101 (1994). The defendant's illegal reentry may have facilitated his attempts to smuggle counterfeit checks into the country, but the fact remains that his immigration offense is separate and distinct from his counterfeit securities crimes in the nature of the societal interests and victims that are harmed.

We hold that the district judge did not commit error when he refused to group Owolabi's count for illegal reentry into the United States with his counts for possessing counterfeit securities of the United States and various private entities for purposes of sentencing because the crimes did not involve harm to the same victim or societal interest.

AFFIRMED.