UNITED STATES of America,
Plaintiff–Appellee,

v.

Olufunke YUSUFF, also known as Stella Johnson, Defendant–Appellant.

No. 95–3219.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 9, 1996.

Decided Sept. 23, 1996.

Barry Rand Elden, Chief of Appeals, Diane MacArthur (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Adam Bourgeois (argued), Chicago, IL, for Defendant–Appellant.

Before COFFEY, KANNE and ROVNER, Circuit Judges.

COFFEY, Circuit Judge.

In February 1994, a federal grand jury indicted Olufunke Yusuff (also known as Stella Johnson) for possessing with the intent to distribute 686 grams of heroin, in violation of 21 U.S.C. § 841(a)(1). Yusuff entered a plea of not guilty and filed a motion to suppress evidence. After a hearing, the district court denied the suppression motion. Yusuff then entered a conditional plea of guilty to the crime charged, pursuant to a plea agreement, in which she reserved her right to appeal the district court's ruling on the suppression motion. The court sentenced Yusuff to 97 months imprisonment to be followed by four years of supervised release and imposed a special assessment fee of $50. Yusuff appeals her sentence and the court's ruling on her suppression motion. We affirm.

## I. Background

The arrest of Olufunke Yusuff arose from an investigation by the Drug Enforcement

Agency (DEA)/Chicago Police Department joint task force at O'Hare airport in Chicago, Illinois. On January 10, 1994, Special Agents James Stewart and Bill Grant (of the U.S. Customs Service) and Officer Judith Martin (of the Chicago Police Department) were on duty at O'Hare airport conducting drug "interdictions and investigations." The officers testified that as part of their drug interdiction operations, they routinely observed passengers disembarking flights from New York to Chicago because of the flow of drugs and money between the two cities.

The observation of the 4:24 TWA flight from New York began when Agent Stewart approached the TWA ticket counter, where he received information from a DEA informant. Upon request, a TWA employee, Gene Cooper, provided Agent Stewart with a list of names of those on the flight; Stewart testified that he was looking for any "generic" or common names that from his experience he believed drug couriers might assume. Interested by the name "S. Johnson," Stewart had Cooper pull information on that passenger from the TWA computer: S. Johnson had booked a one-way flight from New York shortly before take-off and was seated in seat 7C and would therefore be one of the first passengers to disembark.[1]

Agent Stewart told his partners, Agent Grant and Officer Martin, of the information he had received. As the passengers disembarked the 4:24 flight from New York, the officers observed a woman (the defendant, Yusuff) who nervously "looked around" and proceeded to make a telephone call with a calling card at a bank of public phones. Although the officers testified that they were unaware at that time that the woman they observed disembark was in fact "S. Johnson," they were curious because of her nervous behavior and her appearance (she appeared to be an African national). Agent Stewart testified that it is common for drug couriers to nervously place telephone calls upon disembarkation. After the phone call (two to three minutes), the woman began walking down the concourse. While Agent Grant maintained a look-out at the gate, observing the remainder of the disembarking passengers, Agent Stewart and Officer Martin followed the woman, who turned out to be the defendant, Yusuff.

Agent Stewart approached Yusuff, introduced himself as a police officer, and asked if he might speak with her for a few moments and Yusuff agreed. Agent Stewart asked whether she had taken the flight from New York; Yusuff replied she had and was here to visit her sister who was feeling poorly. He then asked her for identification, but she said she was without any form of i.d., except for a calling card in the name of "Nancy Rafael." Upon questioning, Yusuff could not recall where her sister lived or worked. At this point, Agent Stewart informed Yusuff that she was free to leave but he and Officer Martin would like to ask her a few more questions. Yusuff stated that she understood.

Agent Stewart inquired of Yusuff as to the contents of her bag; Yusuff replied that she had packed it herself and no one had given her anything to carry. Stewart asked Yusuff whether she was carrying any currency or narcotics; Yusuff produced a wad of $300 cash from the bag, declaring "that was all she had." Stewart then asked whether they could search the bag. After Yusuff agreed to the search, Officer Martin rummaged through the bag and found nothing but miscellaneous clothing.

After searching the bag, Officer Judith Martin asked Yusuff: "Do you mind if I pat you down?" According to Martin's testimony, Yusuff responded that she did not mind a pat down. Officer Martin placed her hand on the pocket of Yusuff's coat and felt a hard lump. "What is that?" Martin inquired; "Drugs," Yusuff replied. "How much?" Martin questioned; "700 grams," Yusuff confessed.

Upon Yusuff's admission, the officers took her to a more secluded part of the terminal (an empty gate area). The defendant Yusuff then opened her coat and removed a wrapped plastic bundle from underneath a girdle that she was wearing. The bundle,

1. TWA employee Cooper was paid $500 for the information he provided to the DEA. The record does not reveal whether his employer knew of or condoned his actions.

when opened by Officer Martin, revealed a crushed white powder that the officers suspected was narcotics. At this time, the officers placed Yusuff under arrest and advised her of her *Miranda* rights.

Yusuff subsequently was indicted for possessing with the intent to distribute 686 grams of heroin. The defendant filed a motion to suppress the evidence, contending that Officer Martin and Agent Stewart had infringed upon her right to be free of unreasonable searches and seizures. The district court held a hearing. In contrast to Officer Martin and Agent Stewart's testimony, Yusuff testified at the suppression hearing that in response to Officer Martin's request to conduct a pat-down, she replied: "No, you cannot pat me down."

At the close of the suppression hearing, the district court found that the corroborating testimony of the police officers was worthy of credence and that Yusuff had voluntarily consented to the pat-down search. Accordingly, he denied the defendant's motion to suppress the evidence. Following the district judge's ruling on her suppression motion, Yusuff pled guilty, reserving the right to appeal the judge's adverse decision.

## II. Analysis

### A. Consent to Search

 Yusuff argues that the district court erred in concluding that she had consented to Officer Martin's pat down search.[2]

 The Fourth Amendment protects individuals from "unreasonable" searches and seizures. However, a search conducted pursuant to the voluntary consent of an individual is constitutionally permissible. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). The Supreme Court has made it clear that:

a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free to "disregard the police and go about his business," *California v. Hodari D.*, 499 U.S. 621, 628, 111 S.Ct. 1547 [1552] 113 L.Ed.2d 690 (1991), the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature. The Court made precisely this point in *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868 [1879 n. 16] 20 L.Ed.2d 889 (1968): "Obviously, not all intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of the citizen may we conclude that a seizure has occurred."

*Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). "The question of whether a particular encounter is voluntary is a factual one, dependant on the circumstances of each case." *United States v. Nobles*, 69 F.3d 172, 180 (7th Cir.1995) (quoting *United States v. Maldonado*, 38 F.3d 936, 939 (7th Cir.1994), *cert. denied*, — U.S. —, 116 S.Ct. 205, 133 L.Ed.2d 138 (1995)). When evaluating whether a consent to search was voluntary, the court should determine whether a defendant's will was overborne by the police actions. *Schneckloth*, 412 U.S. at 226, 93 S.Ct. at 2047. The factors to be reviewed in determining whether a consent was voluntary include: (1) whether the encounter occurred in a public place; (2) whether the suspect consented to speak with the officers; (3) whether the officers informed the individual that he was not under arrest and was free to leave; (4) whether the individuals were moved to another area; (5) whether there was a threatening presence of several officers and a display of weapons or physical force; (6) whether the officers deprived the defendant of documents she needed to continue on her way; and (7) whether the officers' tone of

---

2. Yusuff also contends that the DEA procedure of randomly asking disembarking passengers if they would mind answering a few questions is unconstitutional. However, it is well established that consensual encounters between police and citizens (such as when law enforcement officers approach an individual and ask him if he would be willing to answer a few questions) do not violate the Fourth Amendment. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). *See also United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

voice was such that their requests would likely be obeyed. *Nobles*, 69 F.3d at 180 (citing *United States v. Robinson*, 30 F.3d 774, 782 (7th Cir.1994); *United States v. McCarthur*, 6 F.3d 1270, 1276 (7th Cir.1993); *United States v. Withers*, 972 F.2d 837, 842 (7th Cir.1992)).

▪ We review deferentially a trial judge's factual finding that a search was consensual, particularly when such a determination is based upon the judge's assessment of witness credibility:

> When the district court's decision rests on credibility determinations, this court has stated that "the trial judge's ... choice of whom to believe is conclusive on the appellate court unless the judge credits exceedingly improbable testimony." *United States v. Cardona–Rivera*, 904 F.2d 1149, 1152 (7th Cir.1990). In other words, "[w]e must accept the evidence unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable fact-finder could accept it." *United States v. Saunders*, 973 F.2d 1354, 1359 (7th Cir.1992).

*United States v. Bradford*, 78 F.3d 1216, 1221 (7th Cir.), *cert. denied*, ⸺ U.S. ⸺, 116 S.Ct. 1581, ⸺ L.Ed.2d ⸺ (1996) (quoting *United States v. Eddy*, 8 F.3d 577, 580 (7th Cir.1993)).

The record reveals that the encounter was in a busy, public area of the airport and the officers stood several feet away from Yusuff. Further, the officers dressed in civilian clothes and did not display weapons nor did they act in a threatening manner. The officers testified that throughout the encounter they spoke in a normal, polite tone of voice. During the initial conversation, Agent Stewart told Yusuff she was not under arrest and was free to leave.

Yusuff argues she did not understand her rights because she is a Nigerian national. However, Yusuff had resided in New York for over five years and spoke fluent English. The trial court found that the officers did not intimidate Yusuff and spoke in polite tones. The district court, who observed the demeanor and testimony of Yusuff, found that any cultural differences that Yusuff had did not negate the voluntariness of her consent. The district court's determination in this regard is entitled to great deference because "it is the trier of fact who has the best opportunity to observe the verbal and non-verbal behavior of the witnesses focussing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture, and body movements, as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record." *Nobles*, 69 F.3d at 181 (quoting *United States v. Eddy*, 8 F.3d 577, 582–83 (7th Cir.1993), *cert. denied*, ⸺ U.S. ⸺, 114 S.Ct. 1663, 128 L.Ed.2d 379 (1994)).

Yusuff further contends that because there was inconsistency between Officer Martin and Agent Stewart's testimony, the district court should have discounted the police testimony and instead believed Yusuff's statement that she refused consent for the patdown search. The "inconsistency" cited by Yusuff is that Officer Martin testified that she asked Yusuff "Do you mind if I pat you down?" whereas Agent Martin testified that the question posed to Yusuff was "Would you consent to an outer patdown of your clothing?" These so-called minor inconsistencies in the police testimony do not undermine their credibility in any significant fashion. Both officers testified that Yusuff clearly consented to a pat down of her clothing; the exact wording of the question fails to alter the most important aspect of the testimony found by the trial court: Yusuff understood their question and voluntarily agreed to a pat down. In contrast, the defendant Yusuff testified that she clearly told the officers that she did not agree to a pat down search.[3]

---

**3.** Yusuff also points to a notation made in the handwritten notes of the Assistant U.S. Attorney from the U.S. Attorney's interview with Agent Stewart. The notes are as follows:

> bag was in front of her [Yusuff] + Judy—I [Agent Stewart] was to her immed rt. *she [Yusuff] said she did mind pat down.* when

> Judy started to pat her, made gesture. I [Agent Stewart] heard her give consent to Judy to pat down.

According to Yusuff, the emphasized line above ("she said she did mind pat down") shows that Yusuff did not consent to the pat down. However, the U.S. Attorney stipulated to the district

Faced with conflicting testimony between the defendant and the police officers regarding the defendant's consent, the district court made a credibility determination and found that the officers were telling the truth. We have emphasized recently that a fact-finder's credibility determinations are entitled to considerable deference on appeal. *See United States v. Berchiolly*, 67 F.3d 634, 639 (7th Cir.1995) (citing *United States v. Hatchett*, 31 F.3d 1411, 1416 (7th Cir.1994)). Based on the record before us, we refuse to overturn the district court's credibility determination and hold that the court did not commit clear error in finding that Yusuff consented to the pat down search. We note that on numerous occasions this court has held that encounters similar to Yusuff's are consensual and do not implicate the Fourth Amendment. *See Nobles*, 69 F.3d 172 (collecting cases).

## B. *Miranda* Rights

■ In order to protect an individual's right against self-incrimination under the Fifth Amendment, the Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), that suspects must be advised of certain rights before they are subjected to "custodial interrogation."[4] A suspect must be both in custody and subject to "interrogation" to trigger the *Miranda* warnings requirement. *United States v. Burns*, 37 F.3d 276, 280 (7th Cir. 1994). An individual is considered "in custody" when his movement is restrained to the degree comparable to a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983).

Yusuff argues that the police officers should have advised her of her *Miranda* rights once Officer Martin felt a lump in Yusuff's pocket and Yusuff told her it was "drugs." Yusuff claims that at that point she was "in custody" because a reasonable person would not have felt free to leave. The district court found that Yusuff was not in custody at that point, and so there was no error in not advising Yusuff of her *Miranda* rights.

■ The standard of review in the Seventh Circuit regarding the district court's determination of the necessity of *Miranda* warnings has been inconsistent, but has been recently clarified by two Supreme Court rulings. We have stated that although the "in custody" determination follows from factual findings, "the ultimate issue of whether there was a custodial interrogation is a mixed question of law and fact" subject to *independent appellate review*. *United States v. Hocking*, 860 F.2d 769, 772 (7th Cir.1988). However, recent cases have acknowledged a trend in our caselaw favoring clear error review for mixed questions of law and fact. *See, e.g., United States v. Humphrey*, 34 F.3d 551, 554 n. 1 (7th Cir.1994). "Nevertheless, we have yet to adopt this standard for reviewing whether a particular interrogation was 'custodial.'" *Id.* (citing *United States v. Jones*, 21 F.3d 165, 168–69 (7th Cir.1994); *United States v. Smith*, 3 F.3d 1088, 1091 (7th Cir. 1993)). However, due to the trend towards clear error review, the continued validity of *Hocking*'s de novo standard of review for *Miranda* determinations has been questioned. *See Jones*, 21 F.3d at 169.[5]

Despite the questions in our caselaw regarding the appropriate standard of review for questions of mixed law and fact in the *Miranda* context, the Supreme Court has

court that the notation was a typographical error, and that Agent Stewart had told her in the interview that Yusuff had said she did *not* mind the pat down search. When read in context, the handwritten notes of the U.S. Attorney do not reflect an inconsistency in the testimony of Agent Stewart, for two lines further down the notes read: "I heard her give consent to Judy to pat down."

4. The *Miranda* rights include warning a suspect that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence

of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479, 86 S.Ct. at 1630.

5. We note that in *United States v. Saadeh*, 61 F.3d 510, 519 (7th Cir.1995), a panel of this court stated that the district court's determination that *Miranda* warnings were not necessary was subject to clear error review. However, *Saadeh* is not good precedent for it fails to mention *Hocking* (mandating de novo review for *Miranda* questions), much less explicitly overrule that line of cases.

recently come down in favor of de novo appellate review. In *Thompson v. Keohane*, —— U.S. ——, ——, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995), the Court held that in the context of habeas corpus review, once the trial court has established the basic "historical" facts (such as who said what, when, and where), the ultimate determination of whether there was "custodial interrogation" requiring *Miranda* warnings is a mixed question of law and fact "*qualifying for independent review.*" Further, in *Ornelas v. United States*, —— U.S. ——, ——, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996), the Court overruled our application of a clear error standard in determining whether a police officer had reasonable suspicion to conduct an investigatory stop, and the Court ruled that such determinations of mixed fact and law should be reviewed de novo on appeal. The Court stated that "[i]ndependent review is ... necessary if appellate courts are to maintain control of, and to clarify the legal principles." *Id.* at ——, 116 S.Ct. at 1662.

We think the Supreme Court's cases cast doubt upon the recent trend in Seventh Circuit caselaw to review evidentiary questions of mixed law and fact for clear error. Moreover, our recent case of *United States v. Baldwin*, 60 F.3d 363 (7th Cir.1995) (holding that the voluntariness of a confession must be reviewed for clear error only), was vacated and remanded in light of *Ornelas*. In sum, we re-affirm our holding in *Hocking* (and the long line of cases it represents) and hold that review of a district court's determination of "custodial interrogation" is reviewed de novo. Of course, we make clear that "historical" facts and any credibility determinations made by the district court are reviewed deferentially, acknowledging that the trial court is in the best position to judge a witness's credibility and demeanor. *See Thompson*, —— U.S. at ——, 116 S.Ct. at 465; *Ornelas*, —— U.S. at ——, 116 S.Ct. at 1663.

■ Thus, we review de novo the trial court's determination that Yusuff did not undergo "custodial interrogation" when Officer Martin asked her what the lump in her pocket was. We note that the pat down was consensual and occurred in a busy, public concourse of Chicago's O'Hare International Airport. Moments before the pat down, the officers had told Yusuff that she was not under arrest and was free to leave. Although Yusuff claimed at the suppression hearing that she did not agree to the pat down search, the trial judge chose to believe the testimony of the police officers more than the defendant, and, as discussed above, we refuse to overturn the trial court's well-supported credibility finding in the record on appeal.

When Officer Martin felt a hard lump in Yusuff's pocket, it was entirely reasonable for her to ask what it was. The officer did not know the lump was drugs at the time. Indeed, she stated at the hearing that "Quite honestly I didn't know what it was. I didn't know if it was something orthopedic, or if it was a hand grenade. It was something hard." Merely by asking what the lump was did not turn the consensual encounter into a "custodial interrogation." Although Yusuff claims that she did not feel free to leave, that is only because she, objectively, knew that the lump was a smuggled bundle of heroin. We believe that a reasonable person, after consenting to a brief pat down search in a busy airport, would not believe themselves in custody if an officer felt a lump (e.g., a back brace or purse) and asked what it was. Thus, we hold that Officer Martin's question of "What's this?" did not constitute custodial interrogation requiring the *Miranda* warnings.

### C. Sentencing

■ The district court sentenced Yusuff based upon the 686 grams of seized heroin, resulting in a base offense level of 28. The court, however, refused to grant a reduction for acceptance of responsibility, finding that Yusuff had committed perjury at the suppression hearing by testifying that she did not acquiesce to the pat-down. *See* U.S.S.G. § 3E1.1. Instead, the court increased the base offense level by 2 levels for obstruction of justice. *See* U.S.S.G. § 3C1.1. Yusuff's offense level of 30 combined with her criminal history category of I, yielded a sentencing range of 97 to 120 months. The judge imposed a sentence of 97 months' imprison-

ment to be followed by four years of supervised release.

"We review the district court's 'factual determinations underlying the application of the guidelines' for clear error." *United States v. Owolabi,* 69 F.3d 156, 162 (7th Cir.1995) (quoting *United States v. Ritsema,* 31 F.3d 559, 564 (7th Cir.1994)). However, questions involving the interpretation of guidelines are subject to *de novo* review. *Id.* (citing *Ritsema,* 31 F.3d at 566). A fact-finder's choice between two permissible choices cannot be clearly erroneous. *Id.* (citing *United States v. Francis,* 39 F.3d 803, 812 (7th Cir.1994)).

The sentencing guidelines provide for a two-level increase in a defendant's offense level if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1. Under the guidelines, obstruction of justice includes the commission of perjury as well as the act of "providing materially false information to a judge or magistrate." U.S.S.G. § 3C1.1 application note 3(d), (f).

At the suppression hearing, Yusuff testified that she explicitly told Officer Martin that she did not consent to the pat down. However, Officer Martin and Agent Stewart both testified that Yusuff consented to the search, and the district court judge found the officers' testimony to be credible. Thus, the court determined that Yusuff had committed perjury at the suppression hearing, attempting to establish that the officers had violated the Fourth Amendment.

The defendant attempts to minimize the quality of her false testimony by arguing that cultural and language differences prevented her from fully understanding her rights. Strangely, Yusuff testified at the hearing that she clearly told Officer Martin that she did not agree to the search, which was in direct contrast to Officer Martin's testimony. Because of the conflict in testimony, there was no clear error in the judge's finding that Yusuff had lied and thus attempted to obstruct justice. *See United States v. Easley,* 977 F.2d 283, 286 (7th Cir.1992) (affirming obstruction of justice enhancement where de-

fendant's testimony at trial conflicted with the testimony of a federal agent); *United States v. Soto–Lopez,* 995 F.2d 694 (7th Cir. 1993) (affirming obstruction enhancement after defendant gave testimony in conflict to federal agents who had conducted an airport drug search); *United States v. Osuorji,* 32 F.3d 1186 (7th Cir.1994) (affirming enhancement for perjury after defendant gave testimony at suppression hearing that directly conflicted with the testimony of the federal officers).

The guidelines allow for a two-level reduction in a defendant's offense level if "the defendant clearly demonstrates an acceptance of responsibility for his offense." U.S.S.G. § 3E1.1. However, the guideline provides also that:

> Conduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. *There may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 apply.*

U.S.S.G. § 3E1.1 application note 4 (emphasis added). Thus, once the sentencing judge determined that Yusuff had committed an obstruction of justice, she was not qualified for a reduction in her offense level for "acceptance of responsibility."

Yusuff argues that her situation is "extraordinary" and that she should receive a reduction for acceptance of responsibility, even though she obstructed justice with her perjury. However, the district judge refused to find her situation "extraordinary" and we review his decision for clear error. *See United States v. Girardi,* 62 F.3d 943, 947 (7th Cir.1995).

Yusuff argues that because she cooperated with the federal authorities and admitted to the substantive offense of possessing heroin her situation is extraordinary. However, as the district court found, Yusuff maintained throughout the proceedings that she had explicitly refused to give consent to the search. Yusuff's statement is material, because, if true, the pat down search was unconstitutional and the evidence against her would be

suppressed. As discussed above, the district court reviewed the testimony of the witnesses and concluded that the officers' version of the encounter was more truthful. Yusuff's situation of admitting guilt, but vigorously conflicting the testimony of the federal officers in order to attempt to suppress the evidence is not an "extraordinary" situation that requires an offense level reduction for acceptance of responsibility. *See United States v. Lallemand,* 989 F.2d 936 (7th Cir. 1993) (affirming reduction where defendant's orders to an agent to destroy evidence occurred before arrest and, *after* arrest, defendant did all he could to cooperate with the authorities).

### III. Conclusion

The conviction and sentence of Olufunke Yusuff are

AFFIRMED.